STATE OF INDIANA    )         IN THE LAKE CIRCUIT/SUPERIOR COURT
                    ) SS:

COUNTY OF LAKE    )       CAUSE NO. 45D05 1 8 0 9 CT 0 0 5 2 7

2018 JUL 6 PM 3 57

MICHAEL ... ...
CLERK LAKE CIRCUIT COURT

[1] **DESHEENA ADAMS**, individually, and as mother and next friend of
[2] **C.B.1**,
[3] **C.B.2**,
[4] **C.H.** and
[5] **C.A.**,
[6] **ROBERTO CABELLO, JR.**,
[7] **MARK COLE**,
[8] **RHONDA COLLIER**, individually, and as mother and next friend of
[9] **J.J.**,
[10] **ARCELIA CRUZ**,
[11] **ANGELINA GUTEIRREZ DE CRUZ**,
[12] **LETICIA M. DE LUNA**, individually, and as mother and next friend of
[13] **S.C.**,
[14] **I.L.**,
[15] **I.O.**, and
[16] **C.D.**,
[17] **DONETTA DILLON**, individually, and as mother and next friend of
[18] **A.D. 1**,
[19] **A.D.2**,
[20] **A.J.**,
[21] **D.S. 1**,
[22] **D.S.2**,
[23] **D.S.3**, and
[24] **D.S.4**,
[25] **LIDUVINA ESPINOSA**,
[26] **ANGELA ESPINOZA**, individually, and as mother and next friend of
[27] **A.E.1**,
[28] **R.E.**,
[29] **N.C.**,
[30] **A.C.**, and
[31] **K.C.**,
[32] **MARIBEL GAMEZ**, individually, and as mother and next friend of
[33] **A.G.1** and
[34] **A.H.G.**,
[35] **MICHELLE GARCIA**, individually, and as mother and next friend of
[36] **E.C.**,
[37] **G.G.**,
[38] **M.G.**,
[39] **A.G.2**, and
[40] **J.G.**,
[41] **STEPHANIE GRIFFIN**,
[42] **RONNITA HALL**,

[43] **KENDRA MABRY**, individually, and as mother and
next friend of
[44] **K.W.1**,
[45] **M.C.1**,
[46] **M.C.2**,
[47] **J.W.1**, and
[48] **J.W.2**,
[49] **AFRICA MCKINNEY**, individually, and as mother
and next friend of
[50] **J.A.**,
[51] **J.M.**, and
[52] **D.W.**,
[53] **VANESSA MCKINZEY**, individually, and as
mother and next friend of
[54] **A.W.** and
[55] **D.M.**,
[56] **WILLIE MOORE**,
[57] **MINERVA RAMIREZ**, individually, and as mother
and next friend of
[58] **D.R.1**,
[59] **C.R.**, and
[60] **M.R.**,
[61] **ANGELENE RIVERA**, individually, and as mother
and next friend of
[62] **D.R.2**,
[63] **A.R.1**, and
[64] **A.R.2**,
[65] **JOSE BLAS CRUZ ROQUE**, individually, and as
father and next friend of
[66] **L.C.C.**,
[67] **DENNIS RUFFINS**, individually, and as father and
next friend of
[68] **I.W.** and
[69] **L.W.**,
[70] **DESHUN SANDERS**,
[71] **ANGELA THORNTON**, individually, and as mother
and next friend of
[72] **J.P.**,
[73] **MAXINE TUCKER**, individually, and as mother and
next friend of
[74] **A.E.2**,
[75] **O.G.1**,
[76] **O.G.2**, and
[77] **L.G.**,
[78] **VALERIE MALLETTE**,
[79] **BREANNA WASHINGTON**, individually, and as
mother and next friend of
[80] **C.W.** and
[81] **K.W.2**,
[82] **LASHARDAY WHITE**, individually, and as mother
and next friend of
[83] **A.M.** and
[84] **J.D.**,

Plaintiffs,

v.

[1] **ATLANTIC RICHFIELD COMPANY**,
[2] **TESORO CORPORATION**,
[3] **E.I. DU PONT DE NEMOURS AND COMPANY**,
[4] **THE CHEMOURS COMPANY**,
[5] **BP AMOCO PLC**,
[6] **BP WEST COAST PRODUCTS, LLC**,
[7] **U.S. SMELTER AND LEAD REFINERY, INC.**
d/b/a U.S.S. Lead Refinery, Inc.,
[8] **MINING REMEDIAL RECOVERY COMPANY**,
[9] **ARAVA NATURAL RESOURCES COMPANY,
INC.**,
[10] **MUELLER INDUSTRIES, INC.**,
[11] **HAMMOND GROUP, INC.**,
[12] **HAMMOND LEAD PRODUCTS,
LLC**,
[13] **HALSTAB, LLC**, and
[14] **HALOX, LLC**.

Defendants.

## COMPLAINT

The Plaintiffs, **DESHEENA ADAMS**, and **C.B.1, C.B.2, C.H.** and **C.A.** by DESHEENA

ADAMS as their mother and next friend, **ROBERTO CABELLO, JR., MARK COLE, RHONDA**

**COLLIER**, and **J.J.** by RHONDA COLLIER as his/her mother and next friend, **ARCELIA CRUZ,**

**ANGELINA GUTEIRREZ DE CRUZ, LETICIA M. DE LUNA**, and **S.C., I.L., I.O.,** and **C.D.**

by LETICIA M. DE LUNA as their mother and next friend, **DONETTA DILLON**, and **A.D.1,**

**A.D.2, A.J., D.S.1, D.S.2, D.S.3,** and **D.S.4** by DONETTA DILLON as their mother and next friend,

**LIDUVINA ESPINOSA, ANGELA ESPINOZA**, and **A.E.1, R.E., N.C., A.C.,** and **K.C.** by

ANGELA ESPINOZA as their mother and next friend, **MARIBEL GAMEZ**, and **A.G.1** and **A.H.G.**

by MARIBEL GAMEZ as their mother and next friend, **MICHELLE GARCIA**, and **E.C., G.G.,**

**M.G., A.G.2,** and **J.G.** by MICHELLE GARCIA as their mother and next friend, **STEPHANIE**

**GRIFFIN, RONNITA HALL, KENDRA MABRY**, and **K.W.1, M.C.1, M.C.2, J.W.1,** and **J.W.2**

by KENDRA MABRY as their mother and next friend, **AFRICA MCKINNEY**, and **J.A., J.M.,** and

**D.W.** by AFRICA MCKINNEY as their mother and next friend, **VANESSA MCKINZEY,** and

A.W. and D.M. by VANESSA MCKINZEY as their mother and next friend, **WILLIE MOORE**, **MINERVA RAMIREZ**, and **D.R.1**, **C.R.**, and **M.R.** by MINERVA RAMIREZ as their mother and next friend, **ANGELENE RIVERA**, and **D.R. 2**, **A.R.1**, and **A.R.2** by ANGELENE RIVERA as their mother and next friend, **JOSE BLAS CRUZ ROQUE**, and **L.C.C.** by JOSE BLAS CRUZ ROQUE as his/her father and next friend, **DENNIS RUFFINS**, and **I.W.** and **L.W.** by DENNIS RUFFINS as their father and next friend, **DESHUN SANDERS**, **ANGELA THORNTON**, and **J.P.** by ANGELA THORNTON as his/her mother and next friend, **MAXINE TUCKER**, and **A.E.2**, **O.G.1**, **O.G.2**, and **L.G.** by MAXINE TUCKER as their mother and next friend, **VALERIE MALLETTE**, **BREANNA WASHINGTON**, and     **C.W.** and **K.W.2** by BREANNA WASHINGTON as their mother and next friend, and **LASHARDAY WHITE**, and **A.M.** and **J.D.** by LASHARDAY WHITE as their mother and next friend, and complain of the Defendants, **ATLANTIC RICHFIELD COMPANY** ("ARCO"), **TESORO CORPORATION** ("Tesoro"), **E.I. DU PONT DE NEMOURS AND COMPANY** ("Du Pont"), **THE CHEMOURS COMPANY** ("Chemours"), **BP AMOCO PLC, BP WEST COAST PRODUCTS, LLC, U.S. SMELTER AND LEAD REFINERY, INC.** ("USS Lead"), **MINING REMEDIAL RECOVERY COMPANY** ("MRRC"), **ARAVA NATURAL RESOURCES COMPANY, INC.** ("Arava"), **MUELLER INDUSTRIES, INC.** ("Mueller"),     **HAMMOND GROUP, INC., HAMMOND LEAD PRODUCTS, LLC, HALSTAB, LLC**, and **HALOX, LLC**. Pleading hypothetically and in the alternative, the Plaintiffs allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this case to recover for damage done to their properties and emotional distress caused by Defendants, who owned and/or purchased lead refineries and other manufacturing processes in the Calumet neighborhood of East Chicago, Indiana, and who subjected Plaintiffs to decades of continuous toxic contamination that continues to this day.

2.     For decades, Defendants' lead smelting, lead refining, production of insecticide, and other manufacturing processes wreaked environmental havoc in the Calumet neighborhood of East Chicago.

3.      Defendants, flouting environmental laws and disregarding the safety and property interests of nearby residents, generated airborne emissions of contaminants from plant stacks and also leaked and/or spilled hazardous contaminants, including lead, arsenic and other hazardous contaminants, including but not limited to cadmium, antimony, and mercury, into the surrounding area, thereby polluting the soil, groundwater, and interiors of Plaintiffs' homes with extremely dangerous levels of these hazardous contaminants.

4.      Lead contamination is associated with severe health risks, including various organ disorders, seizures, respiratory issues, behavioral problems, and learning disabilities.   Arsenic contamination is associated with an increased risk of the development of skin, lung, and liver cancer, as well as lymphoma.

5.      Environmental contamination, even once remediated, also reduces property values and makes it difficult, if not impossible, for homeowners to sell their properties.

6.      Despite Defendants' knowledge of the dangers posed by such contamination to the health and property of residents living near their facilities, and future residents living near on or near their facilities, including Plaintiffs, Defendants failed to warn area residents, including Plaintiffs, of the contamination. Defendants entirely failed to communicate *anything* regarding the contamination to the community in which they operated their facilities in, and they never disclosed to Plaintiffs the fact and extent of the contamination nor the dangers it posed. Plaintiffs did not know and had no reason to know that their health and properties were at risk.

7.      Defendants have never voluntarily agreed to remediate the contamination themselves.

8.      Rather, because of the severity of Defendants' contamination and the risks such contamination poses to residents' health, the United States Environmental Protection Agency ("EPA") placed the area where Plaintiffs own properties on the Superfund's National Priorities List (the "Superfund Site"), triggering EPA's duty to investigate, select, and execute a remediation plan under   the   Comprehensive   Environmental   Response,   Compensation,   and   Liability   Act

("CERCLA"), 42 U.S.C. § 9601.

9.     EPA also kept residents in the dark about the contamination for years, and has only recently, and haphazardly, provided Plaintiffs with information regarding the contamination and the risks it poses to their health and properties.

10.    Since they first learned of Defendants' contamination, the community has held hundreds of meetings to address the remediation process. Though many of those meetings have been attended by EPA and other government representatives, to the best of Plaintiffs' knowledge, not one person representing Defendants has ever attended a community meeting or otherwise provided outreach to the community regarding the contamination Defendants caused.

11.    The combination of contamination, inaction, and failure to inform has created wide-spread anxiety among the current and former residents at the Superfund Site, including Plaintiffs. Those who own real estate within and around the Superfund Site have watched property values plummet, and they cannot sell their homes. Worse, they constantly worry about the health and safety of themselves and their families. They no longer let their children play outside or let their grandchildren visit, and they are left to wonder whether the high incidents of respiratory issues, kidney disorders, cancer, asthma, and learning disabilities that occur frequently in their community were caused by lead and arsenic poisoning or other contaminants endemic to the Superfund Site.

12.    Once Defendants learned that it was even reasonably *possible* that they were responsible for contaminating residents' homes with lead, arsenic, and other hazardous contaminants, the standard of care, consistent the most basic level human decency, required them to reach out to the potential victims, warn residents of the issues, advise residents on how to protect themselves, and assist in remediation efforts. Instead, decades later, to the best of Plaintiffs' knowledge, Defendants still have provided past and present residents living in the contaminated area, including Plaintiffs, with absolutely no acknowledgment of or information regarding the contamination. Fear of liability is no excuse for silence or inaction. No one needs to wait to be sued before fixing, or at least attempting to fix, the mess one creates. The standard of care should not be

measured against the all too common practice of corporate bad actors who hunker down, obfuscate, and deflect responsibility. Defendants have failed to act with any level of decency, willfully and wantonly violating the standard of care they owe Plaintiffs.

13.     Plaintiffs bring this action against the entities who either directly caused the contamination to their homes, yards, schools, parks, playgrounds and neighborhood, or who are successors in liability to such entities; Plaintiffs seek damages for the physical and emotional harms caused by their exposure to lead, arsenic and other toxic contaminants at the Superfund Site, and for the financial and emotional harms caused by the intrusion of these contaminants onto their property, or into their homes and yards.

## PARTIES

### A.     Defendants

14.     Defendant ARCO is a corporation organized under the laws of Delaware, with its principal place of business in California. ARCO is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana. ARCO is a successor in liability to International Lead Refining Company, International Smelting Company, International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, and The Anaconda Company. BP PLC acquired ARCO in April 2000, and ARCO transferred substantially all of its retail and refining assets to BP PLC at that time. BP PLC assumed the environmental liabilities of the assets it acquired and became the successor in interest to ARCO.

15.     BP PLC is a British multinational company headquartered in London, England

16.     Defendant BP WEST COAST PRODUCTS, LLC is a Delaware limited liability company with its headquarters in Los Angeles, California, and is an indirect, wholly-owned subsidiary of BP PLC.  After BP PLC acquired ARCO in April, 2000, ARCO transferred substantially all of its retail and refining assets to BP WEST COAST PRODUCTS, LLC.

17.     Defendant Tesoro is a corporation organized under the laws of Delaware, with its principal place of business in Delaware. Tesoro is authorized to do business in Indiana and regularly

transacts business in Lake County, Indiana. Tesoro acquired ARCO and substantially all of its assets from BP in 2013. Pursuant to the Purchase and Sales Agreement, Tesoro assumed the environmental liabilities of the assets it acquired and became the successor in interest to ARCO and BP.

18.     International Lead Refining Company, International Smelting Company, International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, The Anaconda Company, ARCO, BP, and Tesoro are collectively referred to throughout the Complaint as "ARCO."

19.     Defendant DuPont is a corporation organized under the laws of Delaware, with its principal place of business in Delaware. DuPont is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

20.     Defendant Chemours is a corporation organized under the laws of Delaware, with its principal place of business in Delaware. Chemours is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

21.     Chemours was a subsidiary of DuPont and was successor in interest to DuPont's environmental liabilities. DuPont recently restructured and created Chemours as a separate entity. Chemours has assumed at least some portion of DuPont's liability.

22.     Defendants DuPont and Chemours are collectively referred to throughout the Complaint as "DuPont."

23.     Defendant USS Lead is a corporation organized under the laws of Maine, with its principal place of business in Utah. USS Lead is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

24.     Defendant MRRC is a corporation organized under the laws of Delaware, with its principal place of business in Tennessee. USS Lead is a wholly-owned subsidiary of MRRC.

25.     Defendant Arava is a corporation organized under the laws of Delaware, with its principal place of business in Utah. MRRC is a wholly-owned subsidiary of Arava.

26.     Defendant Mueller is a corporation organized under the laws of Delaware with its

principal place of business in Tennessee. Arava is a wholly-owned subsidiary of Mueller.

27.   Defendant HAMMOND GROUP, INC. is an Indiana for-profit corporation formerly named Hammond Lead Products Inc.

28.   Defendant HAMMOND LEAD PRODUCTS, LLC. is an Indiana limited liability company and is a subsidiary of HAMMOND GROUP, INC.

29.   Defendant HALSTAB, LLC, is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc.

30.   Defendant HALOX, LLC, is an Indiana limited liability company and is a subsidiary of HAMMOND GROUP, INC.

31.   HAMMOND GROUP, INC., HAMMOND LEAD PRODUCTS, LLC, HALSTAB, LLC, AND HALOX, LLC, are collectively referred to throughout this Complaint as "Hammond Lead."

**B.   Plaintiffs**

32.   At all relevant times, each Plaintiff was a resident of Lake County, Indiana.

33.   At all relevant times, with the exception of Plaintiffs MINERVA RAMIREZ, D.R.1, C.R., and M.R. (the "Ramirez Plaintiffs"), each Plaintiff was a resident of the public housing development in East Chicago, Indiana, known as the West Calumet Housing Complex.

34.   The Ramirez Plaintiffs were and are residents of a private, single family home in Zone 3 of the Superfund Site.

35.   Many of the Plaintiffs attended Carrie Gosch Elementary School.

36.   At all relevant times, each Plaintiff was exposed to lead, arsenic, and/or other toxic substances.

**JURISDICTION AND VENUE**

37.   This court has jurisdiction over this matter pursuant to Indiana Trial Rule 75. All events occurred in Lake County, Indiana.

38.   All of the relevant acts and/or omissions set forth in this Complaint took place in Lake County, Indiana.

## FACTS

### Pollution of the Site by USS Lead

39.     Dating back to about 1906, industrial uses of the land in East Chicago, Indiana have resulted in untold impact upon the environment.  This action centers on land designated by the United States Environmental Protection Agency ("EPA") as the U.S. Smelter and Lead Refinery, Inc. Superfund Site (the "Site").

40.     In about 1906, construction of industrial buildings began on and around the Site.

41.     From 1906 to 1920, much of the land on and around the Site was primarily owned and operated by the Delmar Copper Refinery Company to produce and smelt copper.

42.     In 1920, a portion of the land on and around the Site previously owned by the Delmar Copper Refinery Company was acquired by U.S. Smelting, Refining, and Mining, and later transferred to USS Lead.

43.     Among other activities, USS Lead operated a primary lead smelter on 25 acres of its property.

44.     In 1973, USS Lead converted to secondary smelting, recovering lead from scrap metal and old automobile batteries.

45.     USS Lead continued in this capacity until ceasing operations on the USS Lead Superfund Site in or about December 1985.

46.     USS Lead's smelting operations produced waste materials such as blast furnace slag and lead-containing dust emitted by the blast furnace stack and rooftop vents.

47.     USS Lead piled and spread the blast furnace slag, which contained lead and other hazardous substances, on its property adjacent to the Site.

48.     The lead-containing dust from the blast furnace stack was stockpiled on USS Lead's property adjacent to the Site, covering as much as five acres of the property.

49.     In 1975, USS Lead obtained a permit permitting limited discharge of furnace cooling water and storm water run-off into the Grand Calumet River.

50.     USS Lead received a second permit in 1985. Throughout the years that USS Lead

possessed permits, USS Lead frequently and routinely exceeded the permitted discharge amounts.

51.     USS Lead filed for bankruptcy in 1987.

52.     USS Lead's facilities generated airborne emissions of contaminants, including lead and arsenic, from plant stacks into the surrounding area, contaminating the land on which Plaintiffs' homes and yards were built. South of its plant building, U.S.S. Lead also stockpiled waste containing hazardous contaminants from its blast-furnace and, once a year, spread the waste over an adjoining 21 acres of wetlands, which leaked and/or spilled contaminants into the surrounding area, contaminating Plaintiffs' groundwater and yards.

53.     Therefore, at and from its facilities, USS Lead released or caused to be released lead, arsenic, and other contaminants that were aerially deposited, directly released, and/or that migrated onto or near the land on which Plaintiffs' homes, yards, schools and playgrounds were built, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

54.     According to Mueller's 2017 10-Q filing with the SEC, Mueller, Arava, and MRRC each received general notice letters from EPA asserting that they may be Potentially Responsible Parties ("PRPs") in connection with the USS Lead Superfund Site.

55.     Under CERCLA, a PRP is any individual or organization potentially responsible for, or contributing to, a spill or other contamination at a Superfund site. Parent companies may be held responsible for the acts of their subsidiaries under CERCLA when either (1) a basis exists for "piercing the veil" under traditional corporate law principles; or (2) when the parent company actually manages, directs, or conducts operations specifically related to pollution—i.e., operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

56.     On September 20, 2017, EPA and USS Lead, MRRC, Arava, and Mueller entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study of Operable Unit 2 of the U.S. Smelter and Lead Refinery, Inc. Superfund Site ("Administrative Settlement"), under which USS Lead agreed to conduct a

remedial investigation of the groundwater at the Superfund Site and the soil in the area where its former facilities operated at 5300 Kennedy Avenue in East Chicago, Indiana.

57.     Under the Administrative Settlement, Mueller agreed to guarantee financial assurance for USS Lead's CERCLA liability in connection to the Superfund Site.

58.     Throughout their operations and continuing to the present day, Defendants failed to notify residents and property owners, including Plaintiffs, of the contamination and potential adverse health effects associated with exposure to discharges of lead, arsenic, and other hazardous contaminants from Defendants' facilities, and instead kept the existence of the contamination secret from Plaintiffs.

## Pollution of the Site by DuPont

59.     DuPont's manufacturing of lead arsenate insecticide at its East Chicago facility also contributed to pollution of the Site.

60.     DuPont owns property abutting the Site and the property owned by USS Lead.

61.     From 1910 to 1949, DuPont operated a facility, which manufactured lead arsenate insecticide, adjacent to USS Lead.

62.     Historically, DuPont's facility on and around the Site was used to manufacture the pesticide lead arsenate.

63.     Through operation of its facility and use of its property, DuPont has caused hazardous substances such as lead and arsenic to contaminate the Site.

64.     During plant operations, DuPont's facility generated airborne emissions of contaminants, including lead and arsenic, from plant stacks and also leaked and/or spilled contaminants into the surrounding area, contaminating Plaintiffs' groundwater and contaminating the land on which Plaintiffs' homes, yards schools and playgrounds were built. DuPont's facility also contaminated the fill material used to raise the ground level at or nearby Plaintiffs' homes with lead, arsenic and other contaminants.

65.     Even after operations at the DuPont facility ceased, arsenic-contaminated

groundwater continues to migrate from DuPont's property to the surrounding area, including Plaintiffs' residences and former residences. After operations ceased, DuPont continued, and to this day continues, to fail to control hazardous substances on its property, including but not limited to arsenic, cadmium, lead, and zinc which leak and/or spill into the surrounding area, including Plaintiffs' residences and former residences.

66.     Therefore, at and from its facility, DuPont released or caused to be released lead, arsenic, and other contaminants that were aerially deposited, directly released, and/or that migrated onto or near the land on which Plaintiffs' homes and yards were built, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

### Pollution of the Site by Anaconda (ARCO)

67.     In addition to USS Lead and DuPont, Anaconda operated on and around the Site from at least 1938 to 1965.

68.     Anaconda operated on land just to the north of USS Lead's facility and northwest of DuPont's facility.

69.     Anaconda's facility on and around the Site manufactured white lead and zinc oxide.

70.     Through operation of its facility and use of its property, Anaconda has caused hazardous substances such as lead and arsenic to contaminate the Site.

71.     In 1976, ARCO merged with Anaconda, assuming Anaconda's liabilities.

72.     ARCO's operations included a pulverizing mill, white-lead storage areas, a chemical laboratory, a machine shop, a zinc oxide experimental unit building and plant, a silver refinery, a lead refinery, and a baghouse. During plant operations, ARCO's facility generated airborne emissions of contaminants from plant stacks and also leaked and/or spilled contaminants, including lead and arsenic into the surrounding area, contaminating the land on which Plaintiffs' homes, yards, schools and playgrounds were built. ARCO's facility also contaminated the fill material used to raise the ground level at or nearby Plaintiffs' homes with lead, arsenic and other contaminants.

73.     Therefore, at and from its facility, ARCO released or caused to be released lead, arsenic, and other hazardous contaminants that were aerially deposited, directly released, and/or

migrated onto or near the land on which Plaintiffs' homes and yards were built, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

### Pollution of the Site by Hammond Lead

74.    Hammond Lead's manufacturing operations at two locations to the south of the Site have also contributed to its contamination with hazardous substances.

75.    The two Hammond Lead properties are known as the Halstab Division and as the Halox Division.

76.    Hammond Lead has used the two properties to produce lead substances since 1930.

77.    Hammond Lead's manufacturing processes, and its transport of hazardous substances, have resulted in lead particles and other hazardous substances being released into the air.

78.    Through operation of its facility and use of its property, Hammond Lead has caused hazardous substances such as lead and arsenic to contaminate the Site.

79.    This contamination is evidence by an environmental assessment commissioned by USS Lead in the year 2000.

80.    The assessment summarized its findings and conclusions in a document titled "Independent Assessment of the Impacts of Historical Lead Air Emissions in East Chicago, Indiana" (the "Independent Assessment").

81.    A copy of the Independent Assessment was furnished to the EPA.

82.    The Independent Assessment concluded that Hammond Lead's manufacturing operations were a substantial contributor to the lead contamination of the Site.

### West Calumet Housing Complex

83.    In the early 1970s, the East Chicago Housing Authority constructed low-income residential units on the Site (the "West Calumet Housing Complex" or the "Complex") .

84.    The West Calumet Housing Complex was comprised of three-story apartment buildings and brick duplexes with large lawns on the old Anaconda plant site to provide housing for low-income residents.

85.    As associated reporters Sara Burnett and Jason Keyser aptly stated in a September

article: "Modern-day sensibilities would reject such an idea, but when the East Chicago Housing Authority was searching for sites, Executive Director Benjamin Lesniak said there was little available land except 'in vacant areas which are surrounded by industries and undesirable residential areas,' according to a 1966 Chicago Tribune article."

86.     For decades, residents of the West Calumet Housing Complex and other residents on and around the Site were exposed to hazardous levels of lead, arsenic and other contamination as a direct result of emissions and discharges by each Defendant from its facility nearby.

## EPA Investigations

87.     The EPA proposed USS Lead to the National Priorities List ("NPL") on February 7, 1992.

88.     After the 1992 proposal to the NPL, the EPA determined that the USS Lead facility would be best addressed by the Resource Conservation and Recovery Act (RCRA) program.

89.     On November 18, 1993, the EPA issued an Administrative Order on Consent to USS Lead under RCRA 3008(h) authority.

90.     The Administrative Order of Consent was the beginning of more than two decades of EPA involvement at the Site.

91.     Under the Hazard Ranking System, the Site was evaluated in September 2008; this evaluation determined that there was an observed release of lead in the air-migration pathway as well as in the surface-water migration pathway. The Site was listed as a Superfund site on the National Priorities List on April 8, 2009.

92.     The EPA continued to investigate potential sources of contamination at the Site.

93.     In August 2005, the EPA sent letters seeking information from parties potentially responsible for the contamination at the Site.

94.     Letters were sent to ARCO, DuPont, and Hammond Lead, as well as others.

95.     On the basis of its preliminary investigations, the EPA sent General Notice of Liability letters to USS Lead, ARCO, DuPont, and possibly other entities.

96.     The placement of the Site on the NPL triggered EPA's duty to investigate, select, and

execute a remediation plan under CERCLA, 42 U.S.C. § 9601. In November 2012, EPA finally outlined a plan to test and remediate the contaminated properties.

97.     On September 3, 2014, the United States, acting on request of the EPA and the State of Indiana, filed a complaint against ARCO and DuPont.

98.     On October 28, 2014, ARCO and DuPont entered into a consent decree with the United States agreeing to pay roughly $26 million toward the cleanup of the Site.

99.     Under the remediation plan, EPA performed soil sampling for lead and arsenic at the Complex.

100.    According to EPA, lead levels above 400 mg/kg and arsenic levels above 26 mg/kg pose serious health risks and warrant timely response actions.

101.    According to EPA, lead levels above 1,200 mg/kg and arsenic levels above 68 mg/kg pose an imminent and substantial threat to human health and warrant emergency remediation.

102.    Most residents of the Superfund Site, including Plaintiffs, did not even know that they were living on toxic contamination until on or around July 27, 2016, when the City of East Chicago announced that it planned on closing and demolishing the Complex on the Site because EPA testing revealed extremely high levels of lead and arsenic existed in the soil at Complex. The City informed residents of the Complex that, for their own safety, they had to move within 30 to 60 days.

103.    After decades of silence, on July 25, 2016, East Chicago Mayor Anthony Copeland sent letters to residents of the West Calumet Housing Complex, including the Plaintiffs, stating:

> Dear Resident:
>
> Your health and safety are always my first priority. When the City and the East Chicago Housing Authority ("ECHA") recently were informed by the EPA that the ground within the West Calumet Housing Complex was highly contaminated with lead and arsenic, we moved immediately to protect your safety, health, and welfare.
>
> The identification of lead and arsenic poses potential dangers, and that is why I ordered the East Chicago Health Department to offer lead testing to you and your children. Now that we know the levels of lead in the ground in West Calumet Housing Complex, we feel it is in your best interest to temporarily relocate your household to safer conditions. ECHA is asking HUD to provide vouchers for safe,

sanitary housing as soon as possible. Even though this may be a great inconvenience to you, it☐s necessary to protect you and your children from possible harm.

The staff of ECHA, including the Section 8 staff will be assisting you in the coming days, and we will continue to provide you with information as soon as it becomes available.

We ask for your patience and cooperation in this process.

104.     Prior to the letter, each Plaintiff did not know that he or she had been exposed to hazardous levels of lead or other toxins.

105.     Prior to the letter, each Plaintiff did not know that he or she had been injured by his or her exposure to hazardous levels of lead or other toxins.

106.     Although the EPA collected samples from the Site and its residences for more than two decades prior, and had informed Defendants of the contamination – and that Defendants were PRPs, neither the EPA nor Defendants informed Plaintiffs or other residents that they had been exposed to dangerous levels of lead, arsenic and other toxins.

107.     Prior to Plaintiffs' ultimate discovery of their exposure to hazardous levels of lead or other toxins, each Defendant acted intentionally to conceal from Plaintiffs that each Defendant had discharged, released, and/or caused to be released hazardous substances such as lead arsenic, and other toxins.

108.     Neither EPA nor Defendants informed Plaintiffs of the results of EPA's soil testing until on or after September 14, 2016.

109.     Plaintiffs had been living on or near the contamination caused by Defendants for decades, with no knowledge that they and their families were at severe health risk. Defendants never notified Plaintiffs that they caused discharges of hazardous contaminants, including lead and arsenic, into the groundwater at the Site and onto the land on which the Plaintiffs' homes, yards, schools and playgrounds were built, and Defendants never warned Plaintiffs about the potential adverse health effects associated with exposure to such discharges. To this day, Defendants' discharges continue to cause contaminated groundwater to seep into Plaintiffs' basements and drainage systems in and around Zones 2 and 3 of the Superfund Site, and contaminated dust and

soil to actively enter Plaintiffs' homes. Because of Defendants' contamination, the Ramirez Plaintiffs' property values have sharply decreased, and they cannot sell or rent their homes, and Plaintiffs have experienced extreme stress and anxiety.

110.    In 2016 a significant percentage, if not a majority, of Plaintiffs had recently moved to the Complex from various locations in Illinois – the result of a shortage of affordable housing choices in Illinois and elsewhere.  Such persons had no personal knowledge of the Site's history, and were never warned of the danger presented by the "highly contaminated" environment at the Site.

### Plaintiffs' Injuries

111.    Each Plaintiff was exposed to hazardous levels of lead or other toxins while a resident of the Site.

112.    Each Plaintiff has suffered physical, mental, and emotional harm as a direct and proximate result of his or her exposure to the lead, arsenic or other chemical contamination at the Site.

113.    Each Plaintiff has suffered the loss of use and quiet enjoyment of their homes and yards as a direct and proximate result of the intrusion of toxic substances into their yards and homes.

### CAUSES OF ACTION

114.    The following is a non-exhaustive list of causes of action supported by the facts of this case. *ARC Constr. Mgmt., LLC v. Zelenak*, N.E.2d 692, 697 (Ind. Ct. App. 2012) ("Under Indiana's notice pleading system, a pleading need not adopt a specific legal theory of recovery to be adhered to throughout the case."). These causes of action shall not in any way limit the legal bases for liability or recovery in this case.

### COUNT I
### (Strict Liability)

115.    Plaintiffs incorporate the allegations set forth above and below by reference.

116.    Each Defendant manufactured, processed, stored, and/or used materials on its property that could and did result in the release of lead and other hazardous substances impacting persons and property on and around the Site, including each Plaintiff.

117.    The manufacture, processing, storage, and use of materials resulting in the release of lead and other hazardous particles by each Defendant on and around the Site constitutes abnormally dangerous and ultrahazardous activity.

118.    Each Defendant's manufacture, processing, storage, and use of materials resulting in the release of lead particles involves a high degree of risk to persons and property, which cannot be totally eliminated by reasonable care, constitutes an activity not regularly practiced by members of the community, and is an activity located in and around residential areas.

119.    Each Defendant knowingly, recklessly, and/or intentionally discharged, released, and/or caused to be released hazardous substances such as lead, arsenic, and other substances.

120.    Each Plaintiff was a resident nearby each Defendant's operations.

121.    The conduct of each Defendant in its operations resulting in the release of lead and other hazardous particles created a risk of injury and/or damage to others, specifically the Plaintiffs.

122.    Each Defendant had, and has, a duty of care to take reasonable measures to prevent the injury and/or damage to others resulting from its operations on and around the Site.

123.    Each Defendant had, and has, a duty to prevent the release of hazardous substances such as lead and other hazardous particles from escaping its property and control.

124.    Each Defendant is strictly liable to each Plaintiff based upon the injuries suffered by each Plaintiff as a direct result of each Defendant engaging in abnormally dangerous and ultrahazardous activities.

125.    Each Defendant actually knew or should have known that lead and other hazardous particles have the potential to cause serious harm to the Plaintiffs.

126.    As a direct and proximate result of each Defendant's breach of its duties, Plaintiffs have suffered and continue to suffer financial, physical, mental, and emotional damages.

127.    Plaintiffs were each foreseeable persons to suffer the exact type of injuries that each has suffered as a result of each Defendant's release of hazardous substances.

128.    Each Plaintiff has suffered financial, physical, mental, and emotional damages stemming directly from their exposure to lead particles, discharged by each Defendant.

## COUNT II
### (Negligence)

129.   Plaintiffs incorporate the allegations set forth above and below by reference.

130.   The conduct of each Defendant in its operations resulting in the release of lead and other hazardous substances created a risk of injury and/or damage to others, specifically the Plaintiffs.

131.   Each Defendant had, and has, a duty of care to take reasonable measures to prevent the injury and/or damage to others resulting from its operations on and around the Site.

132.   Each Defendant had, and has, a duty to prevent the release of hazardous substances such as lead and other hazardous particles from escaping its property and control.

133.   Each Defendant had, and has, a duty to monitor its operations to ensure that the operations were not resulting in the accumulation of hazardous substances such as lead and other hazardous substances.

134.   Each Defendant had, and has, a duty to control and maintain their operations on and around the Site in a non-polluting manner.

135.   Each Defendant had, and has, a duty not to permit or allow hazardous substances to invade the homes, yards and properties of Plaintiffs.

136.   Each Defendant had, and has, a duty to respond promptly to any release of contaminants in a manner that would prevent or mitigate further migration of contaminants.

137.   Each Defendant had, and has, a duty under the statutes and regulations promulgated by the State of Indiana and its agencies to prevent, contain, and remediate the discharge and/or release of hazardous substances such as lead and other hazardous substances.

138.   Each Defendant had, and has, a duty to warn foreseeable persons who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other hazardous substances.

139.   Plaintiffs were foreseeable persons to each Defendant who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other hazardous substances.

140.    Contaminants of the type discovered in soil in and around the Site do not naturally accumulate in the amounts discovered in the absence of negligent conduct.

141.    The unnatural concentrations of lead and other hazardous substances in the soil in and around the Site can only be the result of human intervention through industrial processes.

142.    Each Defendant exercised exclusive management and control over the lead and other hazardous particles prior to their release and subsequent contamination on and around the Site.

143.    The danger posed by release of hazardous substances such as lead and other hazardous substances is extremely high, necessitating an elevated, proportional degree of care.

144.    Upon learning of the migration of the contaminants, each Defendant had, and has, a duty to take action to stop migration and remediate the contamination.

145.    Each Defendant has breached its duties by its negligent acts and omissions in operating and maintaining its operations on and around the Site, by failing to implement safeguards to assure against the release of hazardous substances such as lead and other hazardous substances, failing to promptly and effectively address the release of hazardous substances such as lead and other hazardous substances, and by failing to prevent migration of contaminants such as lead and other hazardous substances.

146.    Each Defendant actually knew or should have known that lead and other hazardous particles have the potential to cause serious harm to the Plaintiffs.

147.    As a direct and proximate result of each Defendant's breach of its duties, Plaintiffs have suffered and continue to suffer financial, physical, mental, and emotional damages.

148.    Plaintiffs were each foreseeable persons to suffer the exact type of injuries that each has suffered as a result of each Defendant's release of hazardous substances.

149.    Each Plaintiff has suffered financial, physical, mental, and emotional damages stemming directly from their exposure to lead particles, discharged by each Defendant.

## COUNT III
### (Nuisance)

150.     Plaintiffs incorporate the allegations set forth above and below by reference.

151.     The contamination of soil and groundwater with lead, arsenic and other contaminants at, in, on, or beneath Plaintiffs' homes, and the contamination of the interior of Plaintiffs' homes, occurred and persists because of Defendants' acts and omissions including, but not limited to, their operation and maintenance of their facilities and equipment; their handling, storage, use, and disposal of hazardous substances; their failure to promptly and effectively address such contamination to prevent further migration of the contaminants; and/or their failure to abate such contamination known by Defendants to exist on Plaintiffs' premises.

152.     Defendants' contamination of the soil, groundwater, and interiors of Plaintiffs' homes, as well as Defendants' decades-long failure to address such contamination, has substantially interfered with Plaintiffs' reasonable use, development, and enjoyment of their homes, yards and properties.

153.     Plaintiffs have incurred and continue to incur substantial damage as a result of Defendants' contamination, constituting a continuing private nuisance.

## COUNT IV
### Trespass

154.     Plaintiffs incorporate the allegations set forth above and below by reference.

155.     Defendants had a duty to prevent hazardous substances, including lead and arsenic, used and created at their facilities, from contaminating Plaintiffs' homes, yards and properties.

156.     Defendants also have a duty not to allow the continuance of this wrongful trespass.

157.     Defendants breached these duties by their wrongful acts and omissions, resulting in the release of lead, arsenic and other hazardous substances from their facilities into the environment, thus causing the migration of such contamination at, in, on, or beneath Plaintiffs' properties, including soil and groundwater, without consent of Plaintiffs.

158.     These contaminants continue to actively migrate at, in, on, or beneath Plaintiffs'

homes, yards and properties, without consent of Plaintiffs, by the groundwater that Defendants caused to be contaminated.

159.    The invasion of Plaintiffs' homes, yards and other real properties, exclusively possessed by Plaintiffs, by Defendants' contamination, was due to unreasonable, unwarranted, and unlawful conduct of Defendants and constitutes a wrongful trespass upon Plaintiffs' properties.

160.    As a result of Defendants' wrongful trespass, the lawful rights of Plaintiffs to fully use and enjoy their properties have been substantially interfered with, causing Plaintiffs substantial damage.

## COUNT V
### (Intentional Infliction of Emotional Distress)

161.    Plaintiffs incorporate the allegations set forth above and below by reference.

162.    The conduct of the Defendants described above is extreme and outrageous.

163.    The Defendants acted with reckless disregard toward the health, safety, and wellbeing of Plaintiffs and others.

164.    The actions of Defendants described above were both the cause in fact and proximate cause of emotional distress to each Plaintiff.

165.    Each Plaintiff suffered severe emotional distress as a results of the Defendants' actions including emotional distress owing to each Plaintiff's own exposure to hazardous substances and the emotional distress caused by the knowledge and witnessing of the harm forced upon other members of each Plaintiff's household and family.

## COUNT VI
### (Negligent Infliction of Emotional Distress)

166.    Plaintiffs incorporate the allegations set forth above and below by reference.

167.    Each Plaintiff was exposed to a disease-causing agent or substance, including hazardous levels of lead and arsenic, a known carcinogen.

168.    The Defendants are responsible for exposing each Plaintiff to the disease-causing substances.

169.    Each Plaintiff is currently suffering, or has suffered, from emotional distress associated with the fear of contracting a future disease or illness.

170.    Each Plaintiff is currently suffering, or has suffered, from emotional distress associated with the fear of a family member or other closely related person contracting a future disease or illness as the result of the exposure to disease-causing agents or substances due to the actions of the Defendants.

171.    The Plaintiffs who are guardians and/or parents of other Plaintiffs have suffered the anguish and distress of witnessing injury and infliction of exposure to hazardous substances upon the children in their care.

172.    Each Plaintiff has been directly impacted by disease-causing substances as a direct result of the Defendants' actions.

173.    The emotional distress suffered by each Plaintiff was proximately caused by exposure to the disease-causing substances.

174.    Each Plaintiff's fear of contracting a disease or of a loved one contracting a disease as a result of exposure to disease-causing agents is reasonable.

Each Plaintiff has seen an increase in risk of disease as a result of his or her exposure to the disease-causing agent or substance.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court will enter judgment in their favor and against the Defendants, and for the following relief:

A.  damages in amounts that will fairly compensate each of them for the financial, physical and emotional losses, harms, injuries, and damages they have and will sustain as a result of Defendants' wrongdoing;

B.  punitive damages where allowed;

C.  attorneys' fees where allowed;

D.  an award of costs and expenses incurred in the prosecution of this case; and

E.  such further relief as may be fair and just in the premises.

Respectfully submitted,

ALEX MENDOZA LAW, LLC
Attorney for Plaintiffs

Alex Mendoza 30766-49
6950 Indianapolis Blvd.
Hammond, IN 46324
(219) 200-2000 p
(866) 676-4550 f
info@alexmendozalaw.com

## PLAINTIFFS' REQUEST FOR TRIAL BY JURY

The Plaintiffs request a trial by jury of all issues set forth herein that are capable of being tried by a jury.

Respectfully submitted,

ALEX MENDOZA LAW, LLC
Attorney for Plaintiffs

Alex Mendoza 30766-49
6950 Indianapolis Blvd.
Hammond, IN 46324
(219) 200-2000 p
(866) 676-4550 f
info@alexmendozalaw.com