UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| DESHEENA ADAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 2:18-CV-375-PPS-JPK |
| | ) | |
| ATLANTIC RICHFIELD COMPANY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This is an old case that was reassigned to me late last year. [DE 195.] It is one of a series of related toxic tort lawsuits brought in this district by various groups of East Chicago residents.[1] With one exception (the *Alvarez* case), all of these matters have yet to proceed past the pleading stage. The plaintiffs in this case are 54 former residents of the West Calumet Housing Complex, and four individuals who resided nearby in a private, single-family home. Those four individuals who lived adjacent to West Calumet are Minerva Ramirez, D.R.1, C.R., and M.R. (who I'll refer to collectively as "Ramirez"). Plaintiffs claim various entities negligently exposed them to harmful levels of lead,

---

[1] *See Holiday et al. v. Atlantic Richfield Company*, No. 2:16-CV-525 (Dec. 20, 2016); *Barbee et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-193 (Apr. 26, 2017); *Baker et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-429 (Nov. 15, 2017); *Alvarez et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-414 (Oct. 31, 2017). *See also S.A. et al. v. E.I. Du Pont de Nemours and Co. et al.*, No. 2:22-CV-359 (Nov. 22, 2022). In addition to the matters pending before this Court, I am advised that a group of plaintiffs are separately pursuing claims against the City of East Chicago and various other state and municipal entities, as part of two consolidated actions currently pending in Lake Superior Court. *See G.J.2 et al. v. Indiana State Dept. of Health, et al.*, No. 45D05-1803-CT-3 (Mar. 13, 2018). In state court, the plaintiffs assert that the government knowingly and intentionally constructed West Calumet and Carrie Gosch on polluted land, let plaintiffs live there unwittingly, and failed to warn them about the contamination.

arsenic, and other toxins by introducing these hazardous materials decades ago on land adjacent to West Calumet.

Defendants E.I. du Pont de Nemours and Company and the Chemours Company (collectively, "DuPont") and Hammond Lead Products, LLC, Halstab, LLC, Hammond Group, Inc., Halstab, LLC, and Halox, LLC (collectively, "Hammond Lead") have moved to dismiss Plaintiffs' Second Amended Complaint [DE 224] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [DE 228; DE 231.] Defendant Atlantic Richfield Company has also filed a motion to dismiss [DE 236], arguing that the Ramirez plaintiffs' negligence and negligent infliction of emotional distress claims must be dismissed for failure to state a claim.[2] For the reasons explained in this order, I largely agree with the defendants that the claims must be dismissed.

### Procedural Background

One might reasonably wonder how a case filed in 2018 is still at the pleading stage. Here's how we got here. Plaintiffs originally filed this case in state court; it was removed to federal court in late 2018. [DE 1; DE 5.] Plaintiffs sought to remand the case, [DE 60], but in light of a pending appeal in a related matter, *see Baker et al. v. Atl. Richfield Co. et al.*, Nos. 19-3159, 19-3160, 962 F.3d 937 (7th Cir. 2020), the parties stipulated to stay execution of any remand order. [DE 86; DE 92.] In *Baker*, Judge Van Bokkelen found that removal was improper based on the federal officer removal statute, 18 U.S.C.

---

[2] I'll also note that U.S. Smelter and Lead Refinery, Inc., another defendant named in the operative complaint, has answered the pleading. [DE 230.]

§ 1442(a)(1), and he therefore remanded the case. On June 18, 2020, the Seventh Circuit reversed and remanded Judge Van Bokkelen's order granting remand in *Baker*, finding that the case could proceed in federal court because removal was proper under the federal officer removal statute. 962 F.3d at 940.

After the Seventh Circuit's opinion in *Baker* was handed down, the stay in this case was lifted, and Judge Van Bokkelen ordered the parties to file supplemental briefing discussing how, if at all, the Seventh Circuit's decision in *Baker* affected Plaintiffs' position on remand. [DE 107; DE 108.] Plaintiffs subsequently withdrew their motion to remand. [DE 109; DE 110.]

Following this procedural interlude, the originally named defendants sought to dismiss Plaintiffs' operative complaint. [DE 111; DE 113; DE 116; DE 119; DE 122; *see* DE 59.] In the course of the briefing, Plaintiffs agreed to voluntarily dismiss claims against some defendants. [DE 134.] Judge Van Bokkelen took up the balance of the motions to dismiss, and in October 2021 entered a comprehensive opinion and order granting the motions, in part. [DE 157.] Plaintiffs thereafter sought leave to amend the complaint, which the defendants opposed, and Judge Kolar sorted it out in the fall of 2022. [DE 162; DE 180; DE 202.] In the proposed amended complaint, plaintiffs reasserted claims of strict liability, negligence, and NIED claims, and added a cause of action for "medical monitoring," against all defendants. Noting Plaintiffs' complaint presented "several difficult or unsettled legal issues," Judge Kolar granted leave to amend. [*See* DE 180 at 7.]

Initially, Judge Kolar concluded that only 3 of the 84 plaintiffs named in the proposed amended complaint alleged a present physical injury related to "exposure" to toxic substances required to state a negligence claim. The 81 other plaintiffs were denied leave to amend to assert negligence claims, and Judge Kolar found that further amendment would be futile. *Id.* at 9–12. In sum, only Minerva Ramirez, C.R., and Liduvina Espinosa were permitted to proceed on their negligence claims, as they were the only plaintiffs that adequately alleged present physical injuries. *Id.* at 12.

Following Judge Van Bokkelen's prior order, Judge Kolar denied leave to amend to assert strict liability claims for all but the three plaintiffs that alleged physical injuries. *Id.* at 16. As to those three, the defendants argued leave to amend was futile because their alleged activities were not "abnormally dangerous," as required by state law. Noting that state law was not crystal clear on whether manufacturing processes that lead to toxic contamination qualify as abnormally dangerous activities, Judge Kolar was not "certain" that these plaintiffs' strict liability claims were doomed on a motion to dismiss. Accordingly, he granted them leave to amend on the strict liability count. *Id.* at 19.

As to the Plaintiffs' NIED claims, Judge Kolar observed that the Court had previously ruled that absent an injury sufficient to sustain a negligence claim, Plaintiffs could not state an NIED claim based on alleged "emotional distress" damages, standing alone. [DE 180 at 13 (citing DE 157 at 9).] However, following Judge Van Bokkelen's opinion and order, the Indiana Supreme Court issued an opinion potentially supporting an alternative interpretation of state law on this issue and which now muddies the

water. *See Community Health Network, Inc. v. McKenzie*, 185 N.E.3d 368 (Ind. 2022). In light of this new authority, Judge Kolar was not "certain" the proposed NIED claims would fail on a motion to dismiss, so he granted leave to amend with respect to the NIED claims. [DE 180 at 15–16.] All of the named plaintiffs were granted leave to assert NIED claims "based on their allegations of emotional distress." *Id.* at 16.

Finally, Judge Kolar denied leave to amend to assert nuisance claims, noting that nearly all Plaintiffs resided in West Calumet, which had been demolished; and state law "does not contemplate recovery for a past nuisance." [DE 180 at 20.] There was one exception: the Ramirez plaintiffs could proceed on a nuisance theory against DuPont, because they currently reside on the allegedly contaminated land. *Id.* At 20–21. Because case law appeared split on whether a nuisance claim lies where "a defendant's polluting conduct has ceased, but the nuisance has not," Judge Kolar reasoned that it was "not clear" that the Ramirez plaintiffs' nuisance claims would fail on a motion to dismiss, so he granted them leave to amend on this count, as well.[3]

With this complicated procedural background in mind, I now turn to the allegations of Plaintiffs' operative complaint.

---

[3] While not relevant for present purposes, for the sake of completeness, I will also note that Judge Kolar denied leave to amend to assert claims for "medical monitoring," finding that Indiana law does not provide an independent cause of action for medical monitoring. [DE 180 at 16.]

**The Second Amended Complaint**

Plaintiffs are 60 East Chicago residents who previously resided at the West Calumet Housing Complex, a public housing project, or own property near the former site of West Calumet. [DE 224, ¶¶ 26–27.] Evidently, someone in the East Chicago Housing Authority thought it was a good idea to build a large housing project on the site of a former lead refinery. And that's just what happened when the West Calumet project went up in the early 1970s. Unsurprisingly, the site was later designated by EPA as a Superfund Site, and in 2016 the City of East Chicago informed residents of West Calumet that they would have to move out of the housing complex. This mass exodus occurred in 2016 and 2017, and the complex closed for good shortly thereafter. A year later it was demolished. Out of all the Plaintiffs, only the Ramirez plaintiffs, who reside in a single family home located within the Superfund Site, remain.

The pollution at the heart of this case dates back over a century. U.S. Smelter and Lead Refinery, Inc. operated a smelter from 1906 to 1985 that produced lead dust and other hazardous substances, causing contamination of the Superfund Site. From 1910 to 1949, Plaintiffs claim DuPont operated a facility next door that manufactured lead arsenate insecticide, which allegedly "contributed to pollution" of the land. Hammond Lead had its manufacturing operations at two locations south of the Superfund Site, which Plaintiffs claim "also contributed to its contamination with hazardous substances," including lead and arsenic. Finally, Plaintiffs claim that from 1938 to 1965, a

6

predecessor of Atlantic Richfield operated a facility manufacturing white lead and zinc oxide on land later designated part of the Superfund Site.

The EPA has been involved with the Superfund Site for over two decades. In August 2005, the EPA listed among "parties potentially responsible for the contamination at [the Superfund Site]" DuPont, Hammond Lead, and Atlantic Richfield Company and BP West Coast Products, LLC (originally named defendants who were dismissed from the case), along with unidentified "others." In 2009, the Superfund Site was placed on the National Priorities List, and the EPA in 2014 filed suit against Atlantic Richfield and DuPont in connection with pollution on the Superfund Site.  That case was assigned to me, *see* Cause No. 2:14-CV-312-PPS-PRC, and was resolved with a consent decree, pursuant to which the defendants agreed to pay roughly $26 million to clean up the property.

For decades, residents of West Calumet claim they were unwittingly exposed to contamination directly caused by Defendants. Although Defendants knew of the contamination and its dangers, Plaintiffs assert that they "intentionally" and "actively concealed" the fact and extent of the pollution and the dangers it posed. At the same time, Plaintiffs acknowledge the fact that the government investigated pollution at the Superfund Site for many years, put the Superfund Site on the National Priorities list, and pursued an enforcement action against Atlantic Richfield and DuPont to remediate the pollution dating back to 1910. Despite all this action around the Superfund Site years prior to the closure of West Calumet, Plaintiffs claim they were first notified of the

7

contamination and its dangers in July 2016, when the Mayor of East Chicago notified them about results of the EPA's testing at the Superfund Site. While the government collected samples from the Superfund Site for many years during its investigation, Plaintiffs claim they only received these samples in 2016.

That November, West Calumet residents sought to intervene in the government's enforcement action, hoping to weigh in on the remediation plan. I denied the motion to intervene and noted that the proposed clean-up plan was mailed to all residents within two miles of the Superfund Site and notice of the lodging of the consent decree was filed years earlier, in September 2014. *See United States v. Atlantic Richfield Co.*, 324 F.R.D. 187, 189, 191–92 (N.D. Ind. 2018). Plaintiffs nonetheless allege that they were unaware of their exposure to hazardous levels of contamination caused by Defendants' pollution at the Superfund Site until they received notice of the EPA's testing results from the City of East Chicago in July 2016.

The Second Amended Complaint asserts claims for strict liability, negligence, nuisance, and NIED against DuPont, Hammond Lead, U.S. Smelter and Lead Refinery, Inc., and Atlantic Richfield. [DE 224.] More specifically, Counts I and III assert strict liability and negligence claims, on behalf of Ramirez, C.R., and Espinosa, against DuPont, Hammond Lead, and U.S. Smelter. Counts II and IV assert strict liability and negligence claims, on behalf of Ramirez and C.R. only, as against Atlantic Richfield. Ramirez also reasserts a claim for nuisance against DuPont (Count V). Finally, all

Plaintiffs reassert NIED claims based on their exposure to "disease-causing contaminants" and their associated emotional distress (Counts VI–VII).

In sum, the Second Amended Complaint alleges the defendants caused environmental contamination on land where they used to live or currently reside and failed to warn residents of the pollution for decades. This allegedly caused Plaintiffs to suffer physical and emotional damages as a result of ingesting harmful levels hazardous levels of lead and other toxins on their properties. Moreover, the Ramirez plaintiffs allege they have suffered damage in the form of reduced property value. [*See, e.g.*, DE 224, ¶ 102.]

### Requests for Judicial Notice

Before diving into the substance of the motions to dismiss, Atlantic Richfield and DuPont request that I take judicial notice of various documents bearing on Plaintiffs' claims. [DE 235; DE 238.] More specifically, DuPont proffers a 2021 EPA report about the Superfund Site, as well as two warranty deeds, which respectively memorialize transfers of the underlying property from DuPont to Chemours in 2015, and from Chemours to East Chicago Gateway Partners, LLC in 2018. For its part, Atlantic Richfield requests I take judicial notice of the consent decree entered in the 2014 enforcement action, Adams' state court complaint (Cause No. 45D01-1809-CT-000526), four warranty deeds memorializing transfers of the underlying property, and three documents (a warranty deed, a transfer on death deed, and a survivorship affidavit) pertaining to the Ramirez's residence.

As Judge Van Bokkelen previously explained, records of this variety, such as "court records, agency decisions, administrative body reports, and government websites," are "appropriate subjects of judicial notice." [DE 157 at 2 (internal citations omitted).] Plaintiffs have not filed any response to the motions for judicial notice; they will be granted. Therefore, I take notice of the fact that the "documents exist, they say what they say, and they have had legal consequences." *Our Country Home Enters. v. Comm'r of Internal Revenue*, 855 F.3d 773, 782 n.1 (7th Cir. 2017). I will refer to the documents in the following discussion of Plaintiffs' claims, to the extent the relevant facts have bearing on the plausibility of their claims.

## Discussion

Let's start with a brief discussion of the standards that govern my decisionmaking. Under Federal Rule of Civil Procedure 8(a), Plaintiffs' complaint must contain "a short and plain statement showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a). Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

At this stage, I accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiffs. *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021). However, to avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires a

plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Seventh Circuit has explained that a plaintiff must plead facts that "suggest a right to relief that is beyond the speculative level," which requires alleging "enough details about the subject-matter of the case to present a story that holds together." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "[S]heer speculation, bald assertions, and unsupported conclusory statements" in the complaint fail to meet this burden. *Taha*, 947 F.3d at 469.

Defendants first argue this case should be dismissed on the pleadings because it was untimely filed. They also argue that each of the claims—negligence, NIED, strict liability, and nuisance—must all be dismissed for a variety of reasons. I'll take up each of the arguments in turn below.

## I.    Statute of Limitations

First up is Defendants' argument that the adult plaintiffs' claims are barred by the applicable statute of limitations. [DE 234 at 27–31; DE 237 at 23–26. *See also* DE 229 at 15.] *See generally* Ind. Code § 34-11-2-4 (two-year statute of limitations for personal injury actions), § 34-11-2-7 (six-year statute of limitations for property claims). The statute of limitations is an affirmative defense for which Defendants bear the burden of proof. *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003); *see, e.g.*, *Rogers v. Allen*

*Superior Court*, 2017 WL 879635, at *1 (N.D. Ind. Mar. 6, 2017). In other words, plaintiffs

need not anticipate or plead around affirmative defenses like statute of limitations.

*Chicago Building Design v. Mongolian House Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014).

Under Indiana law, which governs here, the limitations period started when

Plaintiffs knew or, in the exercise of ordinary diligence, should have known of their

injuries. *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009) (citing

*Wheling v. Citizens Nat'l Bank*, 586 N.E.2d 840 (Ind. 1992)) (holding it is only necessary

that "some ascertainable damage has occurred"). Here, Defendants tell me the claims are

all time-barred because the complaint acknowledges a wide array of governmental

efforts to investigate pollution at the Superfund Site that occurred several years prior to

the filing of this lawsuit.

It is true that in April 2009, the EPA added the Superfund Site to its National

Priorities List, and in 2014 the EPA filed an enforcement action against Atlantic Richfield

and DuPont. Moreover, in a state-court case filed July 9, 2018, Ramirez asserted that she

"*now* believe[d] . . . emergency soil removal" efforts took place on her property in 2011,

as she saw personnel from the City of East Chicago "working . . . with EPA and [IDEM]

personnel on testing for and remediation of toxic contamination." [DE 238-8 at 11–12

(emphasis added).] However, it's not really clear Ramirez "believe[d]" that to be the case

in 2011, when she observed the testing firsthand. The state court complaint goes on to

say that Ramirez asked the workers "if everything [was] 'O.K.,'" and they replied that

"there was nothing to worry about and that she should not bother herself about it." The

workers did not inform her that "they were testing for or remediating lead" contamination on the property. *Id.* at 12. It was only a "significant time after" these events that "officials from IDEM and the City [of East Chicago] contacted [her] and suggested that the soil in her yard should be removed and remediated," at which point she "realized what the workers she had seen previously were doing." *Id.*

Judge Van Bokkelen previously considered similar arguments in light of the same allegations in the complaint and declined to dismiss the claims on statute of limitations grounds. I will follow this tack and accept Plaintiffs' allegations that they only became aware of the contamination, or should have become aware of the contamination, when they were informed about the results of the EPA testing by the City of East Chicago in July 2016, within the limitations period. [*See* DE 157 at 7–8.] This ruling is further buttressed by a decision of the Indiana Court of Appeals in a parallel case. *State v. Alvarez*, 150 N.E.3d 206, 215–17 (Ind. Ct. App. 2020).

In short, I see no reason to depart from this reasoning, in light of the similarities between the relevant allegations. While the Defendants' statute of limitations argument may ultimately carry the day, that is a matter better left for summary judgment. It would be "irregular" to dismiss a case at this stage on statute of limitations grounds since it is an affirmative defense. *Chicago Bldg. Design*, 770 F.3d at 613 (internal quotation omitted). So for now, I accept as true plaintiffs' allegations that they did not discover their alleged exposure to lead contamination caused by Defendants until July 25, 2016. Therefore, dismissal on statute of limitations grounds will be denied.

## II.      Negligence Claims

Under Indiana law, a negligence claim requires a showing that: (1) the defendant

owed the plaintiff a duty of care; (2) the defendant breached that duty by allowing

conduct to fall below the applicable standard of care; and (3) the plaintiff suffered

compensable injury proximately caused by the defendant's breach. *Knighten v. E. Chi.

Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015). Ramirez, C.R., and Espinosa (all of whom

claim they developed specific ailments as a result of exposure to toxins allegedly

deposited by the defendants) assert negligence claims against DuPont and Hammond

Lead (Count III), and Ramirez and C.R. also assert negligence claims against Atlantic

Richfield (Count IV).[4]

### A.      Atlantic Richfield

First, I'll take up the claims against Atlantic Richfield. It tells me that the claims

must fail because it owed the plaintiffs no duty, the plaintiffs have failed to adequately

allege causation, and the plaintiffs lack the requisite physical impact to state a claim.

[DE 237 at 7–8.] I find the claims fail on the first element: the facts properly before me

reflect that Atlantic Richfield owed these plaintiffs no common law duty of care.

Under Indiana law, "Whether a duty exists is a question of law for the court to

decide." *Goodwin v. Yeakles' Sports Bar and Grill*, 62 N.E.3d 384, 386–87 (Ind. 2016). Courts

---

[4] As pertains to Plaintiffs' allegations of present physical injuries caused by Defendants' alleged negligence, I note that the complaint only provides factual allegations about health conditions directly linked to exposure to hazardous levels of lead and arsenic. [DE 224, ¶¶ 3–4, 93–94.] Plaintiffs' allegations about injuries linked to "other toxins" are vague and undeveloped, and I will therefore not address them.

evaluate the existence of a common law duty of care in light of three factors: "(1) the relationship between the parties; (2) the foreseeabity of the harm; and (3) public policy concerns." *Id.* at 387. "[T]he foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Walker v. City of E. Chicago*, 2017 WL 4340259, at *7 (N.D. Ind. Sept. 29, 2017) (quoting *Goodwin*, 622 N.E.3d at 390). Judge Van Bokkelen concluded Atlantic Richfield owed the Ramirez plaintiffs a duty to exercise reasonable care when handling hazardous materials on its land in order to prevent contamination from leaving its property, based on their allegations that they "resided on land that is within the EPA-designated Site but is not alleged to be on the former Atlantic Richfield property." [DE 157 at 12.]

Atlantic Richfield tells me there is more to the story. It points me to historical deeds showing that its alleged predecessors sold any interest in the property on which it conducted industrial operations by 1946, and sold all interests in land within the Superfund Site by 1949. [DE 238-4; DE 238-5; DE 238-6.] While the complaint does not specify when the Ramirez plaintiffs obtained an interest in their residence, historical deeds reflect Mike and Kathryn Mihalovich transferred a deed for the property to Elroy and Lupe Ramirez in 1966, and that Minerva Ramirez's interest in the property will not accrue until the death of Lupe Ramirez. [DE 238-7; *see* DE 238-9.] All told, these documents reflect a gap of at least twenty years between the ownership of the land in

question by certain predecessors of Atlantic Richfield and the earliest point in time the Ramirez plaintiffs could have obtained an interest in their neighboring property.

On the first round of motions to dismiss, the court did not directly engage with the substance of Atlantic Richfield's argument – that, based on facts properly subject to judicial notice, the Ramirez plaintiffs lack the type of relationship that gives rise to a common law duty of care under this three-pronged balancing test. *See Tyson Fresh Meats, Inc. v. Dykhuis Farms, Inc.,* 2022 WL 971111, at *2 (N.D. Ind. Mar. 31, 2022). Evidently, Judge Van Bokkelen concluded that this claim implicated the duty acknowledged in *Rolan v. Atlantic Richfield Company*, 2017 WL 3191791 (N.D. Ind. July 26, 2017). In that case, Judge Springmann concluded that the plaintiffs (former West Calumet residents) plausibly alleged DuPont's duty to exercise reasonable care when handling hazardous materials in order to prevent contamination from leaving its property. *Id.* at *18. In applying the three-pronged balancing test, she specifically noted that "the parties stand in a relationship as possessors of interests in neighboring properties." *Id.*

Plaintiffs tell me that Atlantic Richfield's duty "has already been established under *Rolan*," because Judge Springmann's analysis of "DuPont's duty . . . applies perfectly to Atlantic Richfield's posture in the present case," with respect to Ramirez and C.R. [DE 243 at 7–8.] But the facts before me suggest that this case is a different kettle of fish. Plaintiffs do not meaningfully dispute the fact that Ramirez and C.R. presently lack an ownership interest in the property, despite residing there; and they do not dispute that Ramirez and C.R. could not have acquired an interest in the property until 1966. *See*

16

*Wallen v. Mapletree Transp. Inc.*, 2016 WL 7449509, at *3 (N.D. Ind. Dec. 28, 2016) ("To establish a claim for negligence under Indiana law, a plaintiff must prove that the defendant owed him a duty of care *at the time of the injury*." (emphasis added)) (citing *Neal v. Cure*, 937 N.E.2d 1227, 1236 (Ind. Ct. App. 2010).

   In other words, at the earliest, these plaintiffs obtained an interest in their property some *twenty years after* Atlantic Richfield's corporate predecessors ceased their industrial activity and sold the properties they owned on the Superfund Site. This significant temporal gap between the parties' interests in the polluting and neighboring properties undermines the notion that Ramirez and C.R. "stand in a relationship as possessors of interests in neighboring properties" in the way that was deemed meaningful in *Rolan. See* 2017 WL 3191791, at *17–18 (noting "DuPont's plant neighbored the property upon which the Plaintiffs live," and plaintiffs specifically alleged "DuPont *owns*, and for many years *owned and operated* a pesticide lead arsenate production facility," in close proximity to the housing project in which plaintiffs resided (emphasis added)). *Accord Neal*, 937 N.E.2d at 1236 ("A claimant asserting negligence must show that the defendant owed her a duty of care *at the time the injury occurred*." (emphasis added)).

   In addition to *Rolan*, Judge Van Bokkelen favorably cited an Indiana appellate court decision, *KB Home Indiana Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297 (Ind. Ct. App. 2010). In *KB Home*, the court revived the plaintiff's negligence claim, which had been dismissed at summary judgment under Indiana's "economic loss doctrine." 928 N.E.2d

at 304. An airplane component manufacturer named L&E discharged chemical solvents into its septic system. Between 1969 and 1990, the solvents "leached" into the surrounding land. *Id.* at 299–300. New owners purchased L&E's stock in 1991, but L&E retained ownership of the business operating on the property. In 1993, L&E's manufacturing assets were sold to another company (Ferco) and the company was renamed as Rockville TBD Corporation. "[S]ometime in 1993," the discharges of solvents ceased. *Id.* at 300.

In 1989, two individuals had purchased unimproved farmland next door. In 1998, these individuals entered an agreement with KB Home to develop that neighboring land into a residential subdivision. *Id.* KB Home started purchasing lots on the neighboring land for purposes of contracting with home buyers – only to uncover in March 2005, following an environmental investigation, that it was contaminated. KB Home sued Rockville, the newer company that owned the manufacturing assets of the predecessor entity (L&E) that had discharged the solvents on the neighboring land decades earlier, claiming that Rockville breached a duty to control and maintain the site and/or its operations on the site in a non-polluting manner and to prevent hazardous substances from invading adjacent properties. *Id.* at 302.

The trial court dismissed the negligence claims at summary judgment, finding that KB Home was barred from asserting such claims as a matter of law under Indiana's "economic loss doctrine." *See* 928 N.E.2d at 304 ("Indiana law . . . is that damage from a defective product or service may be recoverable under a tort theory if the defect causes

personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected. . . . 'Economic losses' occur when there is no personal injury and no physical harm to other property."). The Court of Appeals disagreed. It observed that KB Home did not contract with Rockville to purchase anything. Moreover, any breach of warranty by the two individuals who sold the neighboring plats to KB Home did "not absolve Rockville of responsibility for *its* negligent conduct that may have caused the contamination" under the economic loss doctrine. *Id.* at 305.

While *KB Home* could be read broadly to declare a duty of care owed by landowners to *any* future owners of neighboring properties to exercise reasonable care in their handling of hazardous materials on their property, the court had no occasion to weigh in on such a broad proposition of law (the error assigned on appeal was far narrower). And in any case, the court in *KB Home* did not evaluate the imposition of a common law duty of care whatsoever. Here, the facts properly before me reflect Atlantic Richfield's predecessors sold their interest in the underlying property decades prior to anybody in Ramirez's family residing on a neighboring property within the Superfund Site; and there is no suggestion that Ramirez presently owns the property, in contrast with KB Home. Noting these distinctions, I decline to place dispositive weight *KB Home* as it does not broadly declare a duty owed by property owners handling hazardous materials to any and all future owners of neighboring properties. To the extent it does, again, the facts show that Ramirez does not qualify as an "owner" of the property; so it

is at the very least questionable whether this broader interpretation of the case would save the claims.

Moreover, the complaint specifically cites statements, made in 1966, to the effect that the area in question was "surrounded by industries and undesirable residential areas," and was "vacant." [DE 224, ¶ 78.] This admission substantially undermines the notion that Plaintiffs' alleged injures were reasonably foreseeable under the circumstances. *See Goodwin*, 62 N.E.3d at 392–92. Plaintiffs are entitled to all reasonable inferences from their well-pled factual allegations that support a plausible claim for relief. But, given the record before me, it strains credulity to infer that Atlantic Richfield would have reasonably foreseen the harm to "future residents living on or near their facilities," when in fact, Plaintiffs claim that the land surrounding the facilities was "vacant" and "surrounded by industries" at the point in time they first could have obtained a legal interest in the property.

In sum, because the relationship between the parties is remote, to say the least, and Plaintiffs' factual allegations reflect that their harm was not reasonably foreseeable under the circumstances, Atlantic Richfield owed no common law duty of care to Ramirez and C.R. Accordingly, the negligence claim against Atlantic Richfield will be dismissed with prejudice.

**B.     DuPont and Hammond Lead**

Shifting gears to the negligence claims asserted by Ramirez, C.R., and Espinosa against DuPont and Hammond Lead — these claims will be allowed to proceed. The

defendants renew their argument that the complaint fails to plausibly allege a duty to warn [DE 234 at 21–23], and because these plaintiffs fail to allege they suffered injuries specifically caused by the defendants' activities [*id.* at 19–21; DE 229 at 9–10.]

DuPont essentially asks me to ignore the specific allegation that Defendants kept the pollution a secret from Plaintiffs, and they were only informed of the extent of the pollution in 2016, because this allegation is "conclusory" and "implausible" in context. To be sure, there are facts alleged in the complaint detailing a history of EPA investigation and enforcement activity in connection with the Superfund Site. It's possible that such activity reasonably put Ramirez, C.R., and Espinosa on notice of the contamination of the land prior to receiving a letter from the City of East Chicago in 2016. But they tell me a different story, and it strikes me as a plausible one.

It may be that a preponderance of evidence reflects these plaintiffs reasonably knew of the contamination and the defendants did not owe a duty to warn based on the EPA listing the Superfund Site on its National Priorities list, or based on its enforcement action filed a little over two years prior to this suit. But the question at this stage is whether these plaintiffs have plausibly alleged that they could not have reasonably known of their injuries caused by exposure to hazardous levels of lead contamination because DuPont and Hammond Lead intentionally failed to inform them about their polluting activities. Whether this will in fact be borne out in discovery is anybody's guess. But for now, it's enough to say that it is certainly plausible. As a result, it would be premature to dismiss the plaintiffs' negligence claims based on a failure-to-warn

theory. With the benefit of a more fulsome record after discovery has been taken,

Defendants can of course raise the argument anew at summary judgment.

DuPont further argues that the complaint fails to plausibly assert harms

proximately caused by their alleged introduction of hazardous levels of lead and "other

toxins" on their property. As I previously pointed out [*see supra* n.4], the plaintiffs do not

meaningfully allege a connection between their alleged injuries and any contaminant

other than lead. Because Ramirez, C.R., and Espinosa fail to allege facts clearly linking

their general categories of alleged injuries to exposure to contaminants other than lead,

any injuries allegedly caused by the introduction of those substances onto the land are

entirely speculative. Accordingly, the plaintiffs' negligence claims based on "other

toxins," aside from lead, are dismissed with prejudice for failure to plead causation.

However, these plaintiffs do adequately allege that DuPont and Hammond Lead

proximately caused their alleged injuries based on ingestion of hazardous levels of lead.

Under Indiana law, proximate causation requires both "factual causation" and "legal

causation." *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841, 853 (N.D. Ind. 2004). *See*

*also Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 445 (7th Cir. 2009) ("Courts remain

entirely free to dismiss a claim . . . where the pleadings do not permit a reasonable

inference of proximate cause."). As courts in this case and elsewhere across this district

have repeatedly noted, it is not necessary for Defendants' contamination to be "*the*

proximate cause, but only *a* proximate cause, of the Plaintiffs' injuries to succeed on a

claim of negligence." *See Rolan v. Atl. Richfield Co.*, 2017 WL 3191791, at *18 (N.D. Ind.

22

July 26, 2017) (citing *Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010)) (finding resolution of causation issue required "a more factually intensive inquiry" inappropriate for resolution at the pleadings). [*See* DE 157 at 12–13.]

Defendants take issue with the lack of detail linking their alleged pollution decades ago to these plaintiffs' present physical injuries caused by lead exposure. DuPont notes that Ramirez, C.R., and Espinosa repeatedly allege that they ingested lead that was introduced onto their land by Defendants. But they point to allegations in tension with the view that *their* conduct proximately caused the plaintiffs' alleged exposure to contaminants and resulting injuries. [DE 234 at 19–21.] In that vein, DuPont points out that while the complaint alleges the City of East Chicago offered lead testing to all West Calumet residents, Plaintiffs do not claim that they took advantage of this testing or were found to have elevated lead levels as a result of such testing. *Id.* at 20. Because they have had "four years" to "allege individualized facts on exposure," the argument goes, the negligence claims do not plausibly plead injuries caused by DuPont's alleged conduct and must fail for lack of causation. *Id.*

The story Plaintiffs tell strikes me as entirely plausible, even if Defendants would prefer additional factual allegations more specifically tying *their* alleged lead contamination to Plaintiffs' claimed injuries. At this stage, the allegations put Defendants on notice of Plaintiffs' theory of harm, and that is all Rule 8(a) requires. In sum, following the lead of fellow courts in this district evaluating virtually identical claims, I

decline to dismiss Plaintiffs' negligence claims based on exposure to hazardous levels of lead due to a failure to adequately plead causation.

In sum, Ramirez, C.R., and Espinosa will be permitted to proceed on their negligence claims against DuPont and Hammond Lead. But because the facts properly before me reflect that Atlantic Richfield did not owe a common law duty of care to Ramirez and C.R., I will dismiss the negligence claim asserted against it.

### III.    NIED Claims

Next, I'll address Plaintiffs' claims for negligent infliction of emotional distress, which dovetail with their negligence claims. Judge Van Bokkelen dismissed Plaintiffs' initial NIED claims, finding that no such claim exists under Indiana law unless accompanied by a properly pled, ordinary negligence claim. [DE 157 at 15.] While not all Plaintiffs have a viable negligence claim, all of them nevertheless seek to re-assert NIED claims. [DE 224 at 29.] They claim that Defendants' contamination has caused them to come in contact with contaminants on their properties, and as a result they have suffered emotional distress from the fear that they or their family members could contract an illness in the future.

In *Spangler v. Bechtel*, the Indiana Supreme Court observed, "The right to seek damages for emotional distress in actions for negligence *often referred to as actions for negligent infliction of emotional distress*, is carefully circumscribed under Indiana jurisprudence." 958 N.E.2d 458, 466 (Ind. 2011) (emphasis added). Indiana law had "never permitted . . . an action seeking damages for emotional distress predicated upon

a breach of an alleged duty not to inflict emotional injury on another," and such "independent, stand-alone actions for negligent infliction of emotional distress are not cognizable." *Id.*

As Judge Van Bokkelen previously observed, if *Spangler* controls, the result is straightforward – only those named plaintiffs with cognizable negligence claims based on their present physical injuries may also pursue NIED claims against Defendants. *See, e.g., Vestal v. Heart of CarDon, LLC,* 2018 WL 3008638, at *12 (S.D. Ind. June 15, 2018) (applying *Spangler*) (NIED "is not a stand-alone cause of action, but instead is permitted . . . where the 'defendant's breach of a legal duty to the plaintiff' causes a 'direct impact' upon the plaintiff"). But, again, things are not always so simple. As highlighted by Judge Kolar in granting Plaintiffs leave to amend, he believed Indiana law governing NIED claims may have been altered by the Indiana Supreme Court's decision in *Community Health Network, Inc. v. McKenzie,* 185 N.E.3d 368 (Ind. 2022). To be more specific about it, Judge Kolar was not "certain" about whether *Community Health* changed the landscape on NIED claims. To his credit, and out of an abundance of caution, Judge Kolar allowed the complaint to be amended so the validity of the standalone NIED claims could be fully briefed for my consideration on the pending motions to dismiss.

In *Community Health,* the plaintiffs sued a healthcare provider for negligence based on an employee accessing their medical records without authorization. The plaintiffs' negligence claims sounded in theories of direct liability for negligent supervision, training, and retention, as well as vicarious liability. They did not allege a

25

physical impact or injury – just that they suffered emotional distress as a result of the defendant's negligence with respect to its handling of their medical records. *Id.* at 379. The Court noted that under *Spangler*, "emotional-distress damages are recoverable in negligence-based claims only when a party can satisfy (1) the modified-impact rule or (2) the bystander rule." *Id.* (citing 958 N.E.2d at 466, 471).

I can set the bystander rule aside for our purposes. Under that rule, a standalone NIED claim is permitted absent a direct physical impact on the plaintiff only if the plaintiff has "witnessed or come to the scene soon after the death or severe injury of certain classes of relatives." *Spangler*, 958 N.E.2d at 467. Suppose a mother is at a bus stop with her child when she witnesses her child being run over by an inattentive motorist who is texting and driving. The mother in that case would have a viable NIED claim as a bystander. There is no plausible claim that any of the plaintiffs in this case can be reasonably called bystanders.

But what about the other theory of negligent infliction of emotional distress – the modified-impact rule? *Community Health* itself provides little analysis of the rule, beyond noting that *Spangler* requires that the plaintiff "personally sustained a physical impact," in addition to emotional distress damages. 185 N.E.3d at 379 (citing 958 N.E.2d at 467). The Court found in straightforward fashion that the "undisputed facts establish[ed] that [the plaintiffs] suffered no physical impact" as a result of the misuse of their private medical records.

Digging a little deeper, the Supreme Court has explained that this rule "is known as the 'impact rule' because of the requirement that there be some physical impact on the plaintiff before recovery for mental trauma will be allowed," and it has been the law of the land in Indiana for over "one hundred years." *Shuamber v. Henderson*, 579 N.E.2d 452, 454 (Ind. 1991) (citing *Kalen v. Terre Haute & I.R.R. Co.*, 47 N.E. 694 (Ind. Ct. App. 1897)). "The rule, as applied in Indiana, has three elements: (1) an impact on the plaintiff; (2) which causes physical injury to the plaintiff; (3) which physical injury, in turn, causes the emotional distress." *Id.* (citing *Boston v. Chesapeake & O. Ry.*, 61 N.E.2d 326, 327 (Ind. 1945)).

*Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989 (Ind. 2006) is a useful illustration cited favorably by the Court in *Spangler*. In *Cook*, the plaintiffs were involved in a harrowing incident on a aircraft shortly after the 9/11 tragedy. Essentially, the plaintiffs contended that the airline (and others) were negligent in allowing another passenger to board the aircraft who later engaged in menacing behavior in flight. That passenger marched up and down the aisle, threatened others on board and perpetually smoked cigarettes despite rules to the contrary. 857 N.E.2d at 991–92. The plaintiffs were justifiably terrified by the incident. They argued that breathing smoke from a lit cigarette and experiencing vibrations from stomping feet caused a direct physical impact, as well as a "constructive" impact "by virtue of the physical effects on the [plaintiffs'] vital body functions," like breathing, heart rate, and acuteness of their senses. *Id.* at 998.

With this backdrop, the Court examined case law on the physical impact requirement, *id.* at 998–99, and concluded that "constructive impact" in the form of "physical changes" can satisfy the rule. However, the plaintiffs merely alleged "what can best be described as the human body's natural response to fear and anxiety," which fell short of a "physical change" like, for example, "the destruction of healthy lung tissue" as a result of a physician's failure to diagnose a plaintiff's lung cancer. *Id.* at 998 (citing *Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000) (holding that patient suffering from the destruction of healthy lung tissue due to physician's failure to diagnose cancer was sufficient for negligent infliction of emotional distress)).

The Court in *Cook* then considered whether smelling cigarette smoke and feeling floor vibrations could form a direct physical impact. 857 N.E.2d at 999. While the Court noted plaintiffs' theory "at the very least . . . stretches the outer limits of the impact requirement," it accepted that plaintiffs may experience sensations related to exposure to smoke and vibrations that "may be characterized as physical impact," even if "certainly very 'slight,'" and went on to consider whether plaintiffs' alleged "mental anguish is 'not likely speculative, exaggerated, fictitious, or unforeseeable.'" *Id.* (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1221 (Ind. 2000)). The evidence suggested plaintiffs' fear and anxiety were real but transitory, and they never sought medical treatment for their alleged impacts. The Court accordingly concluded "the physical impact in this case was slight to nonexistent," and "speculative," so "allowing an emotional distress claim to

proceed based on . . . lingering mental anguish would essentially abrogate the requirements of Indiana's modified impact rule." *Id.* at 1000.

As I see it, the takeaway from *Cook* is just how skeptical the Indiana Supreme Court is of standalone NIED claims. The Court acknowledged that claims based on emotional distress alone face an uphill climb, and to the extent a plaintiff can assert a "direct impact" based on emotional distress, such a claim "stretches the outer limits of the impact requirement." 857 N.E.2d at 999. Adding to this, courts evaluating similar claims involving asbestos exposure have concluded that merely asserting the "possibility" that an individual was exposed to asbestos and that exposure "may or may not produce physical injury" do not satisfy the modified-impact rule; but that actual exposure could form a direct impact under the rule. *Adams v. Clean Air Sys., Inc.*, 586 N.E.2d 940, 942 (Ind. Ct. App. 1992). *See also Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 189 (1998) (construing *Adams*).

All of this brings me back to *Community Health*, and whether it worked a change in the law that permits all of the named plaintiffs to move forward with NIED claims, regardless of whether they allege underlying physical injuries sufficient to state ordinary negligence claims. I don't think *Community Health* does anything of the sort. The case does not even meaningfully evaluate the "physical impact" requirement of the modified-impact rule and, in all events, concludes in a single sentence that, under *Spangler*, the plaintiffs did not suffer any "physical impact themselves" as a result of the misuse of their medical records. 185 N.E.3d at 379. To suggest that *Community Health* somehow

29

undermines dozens of earlier cases—cases that have been around for decades—that repeatedly explained and enforced the modified impact rule with respect to NIED claims would be a bridge way too far.

And indeed, the few courts that have evaluated the issue after *Community Health* have reaffirmed the proposition NIED claims "are subject to the modified-impact rule" which requires the plaintiff to have sustained a physical impact before bringing any NIED claim. *Fox v. Franciscan All., Inc.*, 204 N.E.3d 320, 327 (Ind. Ct. App. 2023) (granting summary judgment on negligence claims, including NIED claim, based on defendant's invasion of plaintiffs' privacy, holding that "[l]oss of privacy does not consist of a physical impact [under *Community Health*], and it is undisputed that Plaintiffs here did not sustain physical impacts").

In sum, in the context of the authority that precedes it, it seems clear that *Community Health* is simply an application of the modified-impact rule, not a meaningful change in the law. As such, I see no reason to depart from the reasoning of Judge Van Bokkelen's prior order dismissing Plaintiffs' NIED claims to the extent they failed to adequately allege a standalone negligence claim. [DE 157 at 15.]

Accordingly, only Ramirez, C.R., and Espinosa—who, as previously explained, are the only named plaintiffs with viable "ordinary" negligence claims—may proceed with their NIED claims against DuPont and Hammond Lead. All of the other named plaintiffs' NIED claims will be dismissed with prejudice, for failure to state a claim.

### IV.    Strict Liability Claims

It's on now to the strict liability claims. "Indiana recognizes the doctrine of strict liability stemming from carrying on an abnormally dangerous activity." *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989) (citing *Enos Coal Mining Co. v. Schuchart*, 243 Ind. 692, 188 N.E.2d 406 (1963)). To assess if an activity is subject to strict liability, Indiana courts apply the standard enumerated in the Restatement (Second) of Torts, which provides that one who carries on "an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm," and such liability is "limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." *Fechtman v. U.S. Steel Corp.*, 994 N.E.2d 1243, 1247 (Ind. Ct. App. 2013) (citing Restatement (Second) of Torts § 519 (1977)).

Courts consider six factors to evaluate if an activity is "abnormally dangerous," including: (1) risk of harm; (2) likely severity of that harm; (3) inability to eliminate risk by the exercise of reasonable care; (4) extent to which the activity is not a matter of "common usage"; (5) inappropriateness of the activity for the place where it is carried on; and (6) the extent to which its value to the community is outweighed by its dangerous attributes. *Id.* (citing Restatement (Second) of Torts § 520 (1977); *Bridges v. Ky. Stone Co., Inc.*, 425 N.E.2d 125, 126 (Ind.1981)). In applying these factors, I must consider "the defendant's activity as a whole." The "essential question is whether the risk created is *so unusual*," either due to its "magnitude or because of the circumstances surrounding

31

it" to justify strict liability in tort. *Id.* at 1248–49 (quoting *Erbrich Products Co., Inc. v. Wills*, 509 N.E.2d 850, 856 (Ind. Ct. App. 1987); Restatement (Second) of Torts § 520 cmt. f (1977)). This standard strikes me as amorphous and difficult to apply.

Judge Van Bokkelen previously dismissed Plaintiffs' strict liability claims based on the failure to sufficiently plead a present physical injury—the same issue that doomed the majority of their negligence and NIED claims. [DE 157 at 15–16.] For his part, Judge Kolar concluded amendment was futile for the 81 plaintiffs who failed to plead a present physical injury and denied them leave to amend. While noting that "case law can be read to suggest that the alleged activities are not abnormally dangerous as a matter of law," Judge Kolar granted leave for Ramirez, C.R., and Espinosa to pursue strict liability claims based on their present physical injuries. [DE 180 at 16–19.]

Defendants renew the argument that their purported manufacturing activities are not "abnormally dangerous" under applicable state law. Judge Van Bokkelen did not address this independent ground for dismissal in the first round of motions to dismiss. Having freshly reviewed the cases, I agree with Defendants that their alleged activities were not "abnormally dangerous," as that phrase has been construed by the state courts. Accordingly, the strict liability claims will be dismissed.

For starters, because of how Indiana has defined what amounts to "abnormally dangerous" behavior, it must be pointed out that the scope of strict liability is extremely narrow. Indeed, the Seventh Circuit has observed, "Indiana courts have generally been reluctant to impose strict liability based on the abnormally dangerous activity doctrine."

*Consol. Rail Corp. v. Allied Corp.*, 882 F.2d 254, 257 n.3 (7th Cir. 1989). In *Fechtman*, the state's Court of Appeals put it even simpler terms. Weirdly, "it appears that strict liability for abnormally dangerous activities has been limited in Indiana to blasting and housing wild animals in a residential area." *Fechtman*, 994 N.E.2d 1250 (collecting cases).

Canvassing case law applying the relevant factors to analogous situations, I am persuaded (counterintuitively, I must admit) that Defendant's alleged manufacturing activities are not "abnormally dangerous" in light of the foregoing factors. I'll take *Fechtman* at its word. Judge Kolar, for his part, identified a number of "cases in which manufacturing processes that led to contamination," like the one at issue in this case, "were found not to be abnormally dangerous." [DE 180 at 18.] Take for example *Erbich Products Company v. Wills*. There, the court held that manufacturing and storing chlorine gas was not abnormally dangerous. 509 N.E.2d at 856. The court reasoned: "If the rule were otherwise, virtually any commercial or industrial activity involving substances which are dangerous *only in the abstract* automatically would be deemed as abnormally dangerous. This result would be intolerable." *Id.* (emphasis added).

Moreover, to the extent the defendant could limit risks from the disputed activity through the exercise of reasonable care, the court in *Erbich* held that strict liability does not attach. *Id. Accord Dow Chem. Co. v. Ebling*, 723 N.E.2d 881, 909 (Ind. Ct. App. 2000) (application of pesticides not ultra-hazardous activity subject to strict liability). Indeed, the Seventh Circuit has applied *Erbich* in holding that a defendant's handling of PCBs (a set of highly carcinogenic chemical compounds, formerly used in industrial and

consumer products) is not abnormally dangerous activity—in part because risks associated with the chemicals' disposal could have been limited by the defendant's exercise of reasonable care. *Westinghouse Elec. Corp.*, 891 F.2d at 616–17 ("[C]onsistent with *Erbrich Products*, the manufacture of PCBs cannot be considered abnormally dangerous under Indiana law since the risks therefrom could have been limited by Westinghouse's reasonable care.").

Here, the complaint asserts that each defendant "manufactured, processed, stored, and/or used materials on its property that could and did result in the release of lead and other hazardous substances impacting persons and property on and around the [Superfund Site]," and that the "manufacture, processing, storage, and use of materials resulting in the release of lead and other hazardous particles . . . constitutes abnormally dangerous and ultrahazardous activity." [DE 224 at 21–23.] Atlantic Richfield, DuPont, and Hammond Lead are all alleged to have historically manufactured white lead, lead arsenate insecticide, other unidentified "lead substances," and/or zinc oxide on their properties, and to have released these contaminants during their production processes. *Id.*, ¶¶ 51–56 (DuPont), 62–66 (Atlantic Richfield), 67–71 (Hammond Lead). The details about these three defendants' polluting activities are far less detailed than those pertaining to U.S. Smelter – which notably has not sought to dismiss the claims. *See id.*, ¶¶ 32–46 (detailing U.S. Smelter's operation of a lead smelter on its property and stockpiling of "waste containing hazardous contaminants from its blast-furnace" and the

spreading of "waste over an adjoining 21 acres of wetlands, which leaked and/or spilled contaminants into the surrounding area").

To save their strict liability claims, Plaintiffs try to "incorporate their arguments from their brief in opposition to U.S. Smelter's motion to dismiss the first amended complaint." [*See* DE 243 at 3 (citing DE 132 at 1–4).] But that line of argument is beside the point. There are no specific allegations in the Second Amended Complaint supporting the inference that Atlantic Richfield, DuPont, and Hammond Lead were engaged in "dumping toxic waste" with "the very objective . . . to release it into the environment," as Plaintiffs argue in their opposition. *See id.* Plaintiffs seem to acknowledge this discontinuity in their brief, noting that they "may not have alleged the same level of detail with regard [to the] strict liability of Atlantic Richfield Company, DuPont, and the Hammond Group as they did with U.S. Smelter." In any case, they feel entitled to figure it all out in discovery. *Id.* at 3–4.

I find this line of argument a little befuddling. Plaintiffs have provided threadbare assertions about Defendants' mere *manufacturing* of products involving lead and arsenic. In their brief, they ask me to pretend that they have actually claimed those entities *disposed of* toxic waste adjacent to a residential neighborhood – which they argue constitutes "abnormally dangerous" activity, at least for pleading purposes, under the six-prong factor test. Then, they say, with the benefit of discovery into all four groups of corporate defendants' activities, they will be able to tell whether Atlantic Richfield, DuPont, and Hammond Lead "engaged in the particular type of disposal activity, in a

residential area, that gives rise to strict liability." *Id.* at 4. That is not how it works in our notice pleading regime. A party's well-pled allegations must provide an opponent fair notice of the basis for its legal claims, so as to enable a defense on the merits – not a set of placeholders filled in after a fishing expedition.

In sum, the complaint does not specifically allege any "abnormally dangerous" activity based on the defendants' manufacture of products involving lead and arsenic on their properties many decades ago. Nor do Plaintiffs claim that Atlantic Richfield, DuPont, or Hammond Lead stockpiled or spread waste over land and waterways adjacent to residential neighborhoods, in contrast to its allegations against U.S. Smelter. To the extent those alternative allegations form a basis for "abnormally dangerous" activity under the applicable factors, they are not raised in the complaint as to Atlantic Richfield, DuPont, or Hammond Lead, and I decline to allow Plaintiffs to amend their theory again for the first time in an opposition brief. Accordingly, as to these three defendants, the strict liability claims will be dismissed with prejudice.

### V.    Nuisance Claims

Finally, the Ramirez plaintiffs assert a nuisance claim against DuPont only. [DE 224 at 28–29.] Recall that these four plaintiffs allege they presently reside in a private, single family home on the Superfund Site. While the plant closed in 1949, they claim that contaminated groundwater continues to migrate from DuPont's property to their residence. Judge Kolar granted them leave to amend to assert a private nuisance claim, noting that courts have had "differing interpretations within this district as to

whether a nuisance claim can lie when a defendant's polluting conduct has ceased, but the nuisance has not." [DE 180 at 20–22.]

Indiana Code § 32-30-6-6 defines nuisance as "[w]hatever is: (1) injurious to health; (2) indecent; (3) offensive to the sense; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property," and provides "the subject of an action." Subsection -7 states, "If a proper case is made, the nuisance may be enjoined or abated and damages recovered for the nuisance." Ind. Code § 32-30-6-7. As explained by Judge DeGuilio, in *Hostetler v. Johnson Controls Inc.*:

> The plain language of the statute contemplates an ongoing/present offending activity or condition. Importantly, subsection (8) allows for nuisance to be "enjoined or abated and damages recovered for the nuisance." In other words, this subsection does not provide for damages alone as would happen in a case of an activity or condition that had ceased; rather damages go hand-in-hand with enjoiner and abatement, further suggesting that the statute contemplates a present offending activity or condition. [...] Indiana cases are consistent with this interpretation.

2021 WL 5087261, at *13 (N.D. Ind. Nov. 2, 2021). *See also Ka v. City of Indianapolis*, 954 N.E.2d 974, 981 (Ind. Ct. App. 2011) ("A nuisance claim generally contemplates an action that is designed to cease or lessen the defendant's continued offensive behavior" (quoting *KB Home*, 928 N.E.2d at 307)).

Here, Plaintiffs seek damages, attorney's fees, and costs associated with harms incurred due to DuPont's alleged wrongdoing, but they do not seek abatement or the enjoinment of any ongoing conduct. [DE 224 at 29.] DuPont argues that this "dooms"

the nuisance claim [DE 234 at 26]; but the case it cites for that proposition (*Hostetler*) states that the plaintiffs sought only "compensatory and punitive damages," *see id.* at *1, and the nuisance claim was allowed to proceed, *id.* at *13–14.

The thrust of Plaintiffs' nuisance claim is that DuPont, despite closing down its operations and contributing to remediation efforts along with Atlantic Richfield and the state and federal governments, continues to fail to control hazardous substances emanating from its property, primarily through the groundwater. The claims thus mirror those considered in one of the parallel cases proceeding in this district, *Alvarez v. Atlantic Richfield Company et al.*

In *Alvarez*, while the court acknowledged that DuPont is no longer *generating* contaminants on the property, Plaintiffs adequately alleged ongoing behavior that the Court can enjoin – they claimed that DuPont was permitting previously generated contaminants to migrate to their properties. *Alvarez v. Atl. Richfield Co.*, 2021 WL 3161461, at *7 (N.D. Ind. July 26, 2021). Moreover, as in *Alvarez*, Plaintiffs have adequately alleged that this ongoing migration of previously generated contaminants to their properties has resulted in tangible harms, specifically in the contamination of the soil, groundwater, and interiors of their homes. Separately, they allege health risks and specific health conditions developed as a result of exposure to the contaminants DuPont produced and fails to abate. As in *Alvarez*, that is "more than 'mere annoyance and disruption,'" and sufficiently tangible harm to state a private nuisance claim. *Id.* at *8 (citing *Baker v. Westinghouse Elec. Corp.*, 70 F.3d 951, 955 (7th Cir. 1995)).

From one angle, this all suggests Plaintiffs have a viable nuisance claim. But in its motion, DuPont asserts that the claim must fail, because it no longer owns the property from which the pollution allegedly emanates. [DE 234 at 20; *see* DE 235-2 (2015 Limited Warranty Deed transferring ownership from DuPont to Chemours); DE 235-3 (2018 Limited Warranty Deed transferring ownership from Chemours to East Chicago Gateway Partners, LLC).] *See Alvarez*, 2021 WL 3161461, at *7. In *Alvarez*, Judge Van Bokkelen dismissed nuisance claims against U.S. Smelter and Atlantic Richfield because they "owned their respective relevant properties in the past, not currently," and state law contemplates a nuisance claim as "an action . . . designed to cease or lessen the defendant's *continued offensive behavior*." *Id.* (citing *KB Home*, 928 N.E.2d at 307; *Rolan*, 2017 WL 3191791, at *15). However, he declined to dismiss nuisance claims against DuPont because "it currently owns the relevant property and," despite ceasing operations, "*to this day continues*" to fail to control hazardous substances emanating from the property. *Id.* Based on the facts reflected in the documents DuPont has submitted, it is clear that Judge Van Bokkelen was incorrect. In other words, because DuPont no longer owns the property at issue, they can't abate it. Consequently, the nuisance claim, as it did in *Alvarez,* must fail.

Tellingly, the plaintiffs did not respond to this argument, or any argument for dismissal of the nuisance count, for that matter. [DE 243.] While they attempt to incorporate by reference all arguments "on the issue of pleading negligence" from their prior motions, they do not incorporate any arguments about nuisance claims. And as

DuPont points out, they previously conceded that the initial complaint did not state claims for trespass or nuisance against "all Defendants" [*see* DE 157 at 6], so reference to any prior briefing cannot save their claim against DuPont. Arguments not raised in response briefs are waived. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (same). Because the Plaintiffs have not meaningfully responded to DuPont's arguments for dismissal, it appears they have abandoned it. Therefore, it will be dismissed with prejudice.

**ACCORDINGLY:**

For the reasons explained in this opinion and order, DuPont's and Atlantic Richfield's unopposed motions for judicial notice [DE 235; DE 238] are **GRANTED**. The motions to dismiss the Second Amended Complaint [DE 224] filed by Defendants Atlantic Richfield [DE 236], DuPont [DE 231], and Hammond Lead [228] are **GRANTED IN PART** and **DENIED IN PART**, as follows:

Counts I and II, asserting strict liability claims against Atlantic Richfield, DuPont, and Hammond Lead, are **DISMISSED WITH PREJUDICE** for failure to state a claim. Count I remains pending against Defendant U.S. Smelter.

Counts IV and VII, asserting negligence and negligent infliction of emotional distress claims against Atlantic Richfield, are **DISMISSED WITH PREJUDICE** for failure to state a claim.

Count V, asserting a private nuisance claim against DuPont, is **DISMISSED WITH PREJUDICE** for failure to state a claim.

Plaintiffs Minerva Ramirez, C.R., and Liduvina Espinosa—who, as previously explained, are the only named plaintiffs with viable "ordinary" negligence claims—may proceed with their NIED claims against DuPont and Hammond Lead (Count VI). As to all other named Plaintiffs, Count VI, asserting claims for negligent infliction of emotional distress on behalf of all Plaintiffs against DuPont and Hammond Lead, is **DISMISSED WITH PREJUDICE** for failure to state a claim. Count VI remains pending against Defendant U.S. Smelter.

In all other respects, the motions to dismiss [DE 228; DE 231; DE 236] are **DENIED**.

**SO ORDERED**.

ENTERED: September 29, 2023.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT