UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| DESHEENA ADAMS, *et al.*,     ) | |
|                    ) | |
|      Plaintiffs,        ) | |
|                    ) | |
|        v.           ) | Cause No. 2:18-CV-375-PPS-AZ |
|                    ) | |
| ATLANTIC RICHFIELD COMPANY,   ) | |
| *et al.*,                   ) | |
|                    ) | |
|      Defendants.      ) | |

### OPINION AND ORDER

This action is one of several related toxic tort lawsuits brought in this district by various groups of East Chicago residents.[1] The plaintiffs in this case are 54 former residents of the West Calumet Housing Complex, and four individuals who resided nearby in a private, single-family home. Those four individuals who lived adjacent to West Calumet are Minerva Ramirez, D.R.1, C.R., and M.R. (who I'll refer to collectively as "Ramirez," unless context requires otherwise). Plaintiffs claim various entities negligently exposed them to harmful levels of lead, arsenic, and other toxins by introducing these hazardous materials decades ago on land adjacent to West Calumet.

After this matter was transferred to me in late 2022, I ruled on a round of motions to dismiss Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [DE 195; DE 224 (SAC); *see* DE 228 (Hammond

---

[1] *See Holiday et al. v. Atlantic Richfield Company*, No. 2:16-CV-525 (Dec. 20, 2016); *Barbee et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-193 (Apr. 26, 2017); *Baker et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-429 (Nov. 15, 2017); *Alvarez et al. v. Atlantic Richfield Company et al.*, No. 2:17-CV-414 (Oct. 31, 2017). *See also S.A. et al. v. E.I. Du Pont de Nemours and Co. et al.*, No. 2:22-CV-359 (Nov. 22, 2022).

Lead MTD); DE 231 (DuPont MTD); DE 236 (Atlantic Richfield MTD).] In a forty-one page Opinion and Order entered September 29, 2023, I summarized the complex procedural history of the case and largely agreed with Atlantic Richfield, DuPont, and Hammond Lead that the Second Amended Complaint failed to state plausible claims for various state-law torts. [DE 251.] Plaintiffs subsequently filed a motion seeking reconsideration of the dismissal with prejudice of various of their claims against these three defendants. [DE 257.] On May 13, 2024, I entered a detailed Opinion and Order denying Plaintiffs' motion for reconsideration, finding their arguments amounted to mere disagreement on application of Indiana case law relevant to their negligence and NIED claims. [DE 294.]

U.S. Smelter and Lead Refinery, Inc. ("U.S. Smelter"), the other defendant named in the Second Amended Complaint, opted not to file a motion to dismiss the Second Amended Complaint, but rather an answer denying Plaintiffs' allegations and raising various affirmative defenses. [DE 230.] Following my ruling on the last round of motions to dismiss, U.S. Smelter filed a motion for judgment on the pleadings, seeking dismissal of Plaintiffs' claims for strict liability (Count I), negligence (Count III), and NIED (Count VI), based largely on the same pleading deficiencies addressed in my prior order. [DE 262.] For the reasons that follow, I conclude that Minerva Ramirez, C.R., and Liduvina Espinosa have plausibly stated claims for negligence and negligent infliction of emotional distress against U. S. Smelter; however, the remaining Plaintiffs fail to state plausible NIED claims under Indiana's modified impact rule, and the strict

2

liability claims fail for the same reasons addressed in my prior orders.

## Background

In ruling on the pending motion, I assume familiarity with both the operative factual allegations in the Second Amended Complaint and my analysis of Plaintiffs' state law claims sounding in negligence, negligent infliction of emotional distress, nuisance, and strict liability. [DE 224; DE 251.] As detailed in my prior Opinion and Order, this case has an extensive procedural history; I will not repeat my earlier summary of the relevant orders entered by Judge Van Bokkelen and former Magistrate Judge Kolar. [*See* DE 251 at 2–11.] It's enough to say that when I received the case following Judge Van Bokkelen's ruling on an initial round of motions to dismiss, it was already years in the making. [*See* DE 157; DE 195.] With each successive round of pleadings, Plaintiffs have tried to adequately allege injuries caused by the defendants' polluting activities to conform to the Court's rulings. This protracted process has proceeded over the better part of *six years*. Yet Plaintiffs press that it should go on still longer. After I recently denied their motion for reconsideration on the dismissal with prejudice of various of their claims, Plaintiffs responded by filing a motion seeking leave to file a *third* amended complaint. [*See* DE 296.] Whether they can meet their burden to do so is a question for another day. What matters for purposes of evaluating U.S. Smelter's motion are the allegations in the operative complaint.

Plaintiffs are 60 East Chicago residents who either previously resided at the West Calumet Housing Complex (a public housing project) or own property near the former

site of West Calumet. [DE 224, ¶¶ 26–27.] Evidently, someone made the ill-advised decision to build a large housing project on the site of a former lead refinery. It was no surprise, therefore, that just a couple decades later, the site was designated by the EPA as a Superfund Site. In 2016, the City of East Chicago informed residents of West Calumet that they would have to move out of the housing complex. This mass exodus occurred in 2016 and 2017, and the complex closed for good shortly thereafter. A year later it was demolished. Out of all the Plaintiffs, only the Ramirez plaintiffs, who reside in a single family home located within the Superfund Site, remain.

U.S. Smelter operated a smelter from 1906 to 1985 that produced lead dust and other hazardous substances, causing contamination of the Superfund Site. U.S. Smelter's polluting activities allegedly "produced waste materials such as blast furnace slag and lead-contaminating dust emitted by the blast furnace stack and rooftop vents," and Plaintiffs claim the company "piled and spread" and "stockpiled" these materials on property adjacent to the Superfund Site. [DE 224, ¶¶ 39–41.] U.S. Smelter's facilities generated airborne emissions of contaminants, including lead and arsenic, from plant stacks into surrounding areas, including land on which Plaintiffs' homes and yards were built years later, and spread over adjoining wetlands, contaminating Plaintiffs' groundwater and yards. *Id.*, ¶ 45.

Various other companies are also alleged to have contributed to pollution on the land in question through industrial operations that took place nearby many decades earlier. From 1910 to 1949, Plaintiffs claim DuPont operated a facility next door that

manufactured lead arsenate insecticide, which allegedly "contributed to pollution" of the land. *Id.*, ¶¶ 51–59. Hammond Lead had its manufacturing operations at two locations south of the Superfund Site, which Plaintiffs claim "also contributed to its contamination with hazardous substances," including lead and arsenic. *Id.*, ¶¶ 67–75. Finally, Plaintiffs claim that from 1938 to 1965, a predecessor of Atlantic Richfield operated a facility manufacturing white lead and zinc oxide on land later designated part of the Superfund Site. *Id.*, ¶¶ 60–66.

The EPA has been involved with the Superfund Site for over two decades. In August 2005, the EPA listed among "parties potentially responsible for the contamination at [the Superfund Site]" DuPont, Hammond Lead, and Atlantic Richfield Company and BP West Coast Products, LLC (originally named defendants who were dismissed from the case), along with unidentified "others." [DE 224, ¶¶ 86–87.] In 2009, the Superfund Site was placed on the National Priorities List, and the EPA in 2014 filed suit against Atlantic Richfield and DuPont in connection with pollution on the Superfund Site. *See id.*, ¶¶ 84, 90–91. That case was assigned to me, *see* Cause No. 2:14-CV-312-PPS-PRC, and was resolved with a consent decree, pursuant to which the defendants agreed to pay roughly $26 million to clean up the property.

Relatedly, in September 2017, years after the smelting operation was shut down and U.S. Smelter had filed for bankruptcy, the EPA, U.S. Smelter, and related companies entered an administrative settlement. U.S. Smelter agreed to conduct a remedial investigation of the groundwater at the Superfund Site and the soil in the

surrounding area in East Chicago, and another company (Mueller Industries, Inc., a non-party to this lawsuit) agreed to guarantee financial assurance for U.S. Smelter's liability in connection with the Superfund Site. [DE 224, ¶¶ 49–50; *see id.*, ¶ 44.]

The residents of West Calumet claim they were unwittingly exposed to contamination caused, in part, by U.S. Smelter's polluting activities. Although the company knew of the contamination and its dangers, Plaintiffs assert that the named defendants "intentionally" and "actively concealed" the fact and extent of the pollution and the dangers it posed. At the same time, Plaintiffs acknowledge the fact that the government investigated pollution at the Superfund Site for many years, put the Superfund Site on the National Priorities list, and pursued an enforcement action against Atlantic Richfield and DuPont to remediate the pollution dating back to 1910. Despite all this action around the Superfund Site years prior to the closure of West Calumet, Plaintiffs claim they were first notified of the contamination and its dangers in July 2016, when the Mayor of East Chicago notified them about results of the EPA's testing at the Superfund Site.

That November, West Calumet residents sought to intervene in the government's enforcement action, hoping to weigh in on the remediation plan. I denied the motion to intervene, noting that the proposed clean-up plan was mailed to all residents within two miles of the Superfund Site and notice of the lodging of the consent decree was filed years earlier, in September 2014. *See United States v. Atlantic Richfield Co.*, 324 F.R.D. 187, 189, 191–92 (N.D. Ind. 2018). Plaintiffs nonetheless allege

that they were unaware of their exposure to hazardous levels of contamination caused by Defendants' pollution at the Superfund Site until they received notice of the EPA's testing results from the City of East Chicago in July 2016.

In sum, the Second Amended Complaint alleges U.S. Smelter and the other named defendant entities caused environmental contamination and for many decades failed to warn residents of the pollution. This allegedly caused Plaintiffs to suffer physical and emotional damages as a result of ingesting harmful levels of lead and other toxins on their properties. Moreover, the Ramirez plaintiffs allege they have suffered damage in the form of reduced property value. [*See, e.g.*, DE 224, ¶ 102.] Counts I and III respectively assert strict liability and negligence claims against U.S. Smelter, on behalf of Ramirez, C.R., and Espinosa. Finally, in Count VI, all Plaintiffs reassert NIED claims against U.S. Smelter based on their exposure to "disease-causing" contaminants and their associated emotional distress.

## Discussion

Under Federal Rule of Civil Procedure 8(a), Plaintiffs' complaint must contain "a short and plain statement showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a). Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings after "the pleadings are closed" (*i.e.*, after the filing of a complaint and an answer), "but early enough not to delay trial." Fed. R. Civ. P. 12(c). *See also N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). Such motions are reviewed "much like Rule 12(b) motions to dismiss for failure to state a

claim," with the only real difference being that a party may file a Rule 12(b)(6) motion prior to filing its answer. *N. Indiana Gun & Outdoor Shows*, 163 F.3d at 452 n.3. *See also Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir. 1996).

Accordingly, "[t]o survive a motion for judgment on the pleadings (or a motion to dismiss), the complaint must 'state a claim to relief that is plausible on its face.'" *ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 746 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making this assessment, I "draw all reasonable inferences and facts in favor of the non-moving party." *Id.* (citing *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015)). However, this requires more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The circuit has explained that "[t]he complaint 'must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Serv., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)).

U.S. Smelter has denied all the relevant allegations. [DE 230.] But for present purposes, the relevant question is whether the facts alleged, credited as true, amount to cognizable claims for relief under the law. The company raises a number of arguments for why the negligence, NIED, and strict liability claims must be dismissed, and I'll now take up each claim in turn.

8

## I. Negligence

Let's start with Count III, a negligence claim brought against U.S. Smelter by Ramirez, C.R. and Espinosa. Under Indiana law, a negligence claim requires a showing that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty by allowing conduct to fall below the applicable standard of care; and (3) the plaintiff suffered compensable injury proximately caused by the defendant's breach. *Knighten v. E. Chi. Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015).[2] U.S. Smelter raises the same argument Atlantic Richfield presented in defending the claim: it owes the plaintiffs no duty of care. [*See* DE 263 at 9–12.]

Under Indiana law, "Whether a duty exists is a question of law for the court to decide." *Goodwin v. Yeakles' Sports Bar and Grill*, 62 N.E.3d 384, 386–87 (Ind. 2016) (citing *Yost v. Wabash College*, 3 N.E.3d 509, 515 (Ind. 2014)). Courts evaluate the existence of a common law duty of care in light of three factors: "(1) the relationship between the parties; (2) the foreseeabity of harm; and (3) public policy concerns." *Id.* at 387. "[T]he foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Id.* at 390 (quoting *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind. Ct. App. 1996)).

---

[2] As pertains to Plaintiffs' allegations of present physical injuries caused by U.S. Smelter's alleged negligence, I note that the complaint only provides factual allegations about health conditions directly linked to exposure to hazardous levels of lead and arsenic. [DE 224, ¶¶ 3–4, 93–94.] Plaintiffs' allegations about injuries linked to "other toxins" are vague and undeveloped. Therefore, as with the other defendants' motions to dismiss, I will not address them.

Plaintiffs allege that U.S. Smelter ceased operations on the Superfund Site in December 1985. Based on this, the company asserts that it was not foreseeable that its alleged contaminating activities would cause these three plaintiffs harm. [DE 263 at 10.] As I noted in ruling on Atlantic Richfield's motion to dismiss [DE 251 at 15–16], documents properly subject to judicial notice reflect that Minerva Ramirez and C.R. obtained an interest in their neighboring residence, at the earliest, in 1966. [*See* DE 238-4; DE 238-5; DE 238-6; DE 238-7; DE 238-9.] Because Atlantic Richfield allegedly shut down its operations in 1946 and sold all interests in land within the Superfund Site by 1949, I was persuaded that the Ramirez plaintiffs lacked the type of relationship with Atlantic Richfield that gave rise to a common law duty of care under the foregoing three-pronged balancing test, so I dismissed their negligence claim.

By contrast, U.S. Smelter's activities at the site continued well into the 1980's. As a result, the same temporal gap does not exist between the alleged pollution and the Ramirez plaintiffs' property interest. When viewing the matter in the light most favorable to the Ramirez plaintiffs, there is a potential overlap of some twenty years between when Ramirez acquired the property and when U.S. Smelter was allegedly polluting the area. And, of course, U.S. Smelter's operations continued after the construction of the West Calumet complex in the early 1970s. Therefore, I refuse to stretch my prior analysis to fit this distinct set of allegations against U.S. Smelter. Crediting the SAC's allegations as true, which I must at this stage, it strikes me as

reasonable to infer that Plaintiffs' alleged injuries were foreseeable, at least following construction of West Calumet and prior to the closure of U.S. Smelter's plant.

For these reasons, I find that Ramirez and C.R. have plausibly alleged that U.S. Smelter owed them a duty, as possessors of interests in a neighboring property, to exercise reasonable care in the handling of hazardous materials. *See Rolan v. Atlantic Richfield Company*, 2017 WL 3191791 (N.D. Ind. July 26, 2017) (holding DuPont owed duty of care to possessors of interests in neighboring properties where it was reasonably foreseeable that alleged conduct could harm neighboring property and possessor's interest therein). The facts highlighted above support the conclusion that Ramirez and C.R. "stand in a relationship as possessors of interests in neighboring properties" in the way that was deemed meaningful in *Rolan*. *See* 2017 WL 3191791, at *17–18 (noting "DuPont's plant *neighbored* the property upon which the Plaintiffs live," and plaintiffs specifically alleged "DuPont owns, and for many years owned and operated a pesticide lead arsenate production facility," in close proximity to West Calumet). While I earlier found that faithful application of the duty analysis in *Rolan* did not support a colorable claim against Atlantic Richfield, for the reasons discussed above, *Rolan*'s analysis plainly supports the Ramirez plaintiffs' claim against U.S. Smelter.

I discuss Espinosa's claim separately because, frankly, it is confusing that U.S. Smelter would seek to dismiss her negligence claim. Espinosa, like Ramirez, claims she contracted cancer as a result of her ingestion of lead deposited by the defendants; but

unlike Ramirez, she resided at the West Calumet complex. [DE 224, ¶¶ 26, 110, 154; *see id.*, ¶¶ 108, 152.] Unlike Ramirez and C.R., Espinosa did not assert a negligence claim against Atlantic Richfield. *Id.* at 23, 27. And I previously allowed her analogous negligence claims against DuPont and Hammond Lead to go forward. [*See* DE 251 at 20–24.]

U.S. Smelter boldly claims that the complaint contains "zero identifying information" about Espinosa and suggests that her allegations are "conclusory." [DE 263 at 11.] However, the complaint plainly alleges that she resided at West Calumet – property adjacent to U.S. Smelter's polluting activities. As with Espinosa's negligence claims against DuPont and Hammond Lead, I see no reason to cut her claim short at the pleadings. U.S. Smelter's arguments as to the duty of care fail for the same reasons discussed above and previously acknowledged by Judge Springmann in *Rolan*. While the allegations supporting the conclusion that Espinosa contracted cancer *because of* U.S. Smelter's polluting activities may be sparse, at this point, she has alleged enough to lay out a coherent theory of factual and legal causation, as required by Indiana law. *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841, 853 (N.D. Ind. 2004). *See also Rolan*, 2017 WL 3191791, at *18  (finding resolution of causation issue required "a more factually intensive inquiry" inappropriate for resolution at the pleadings) (citing *Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010)).

In sum, U.S. Smelter has not met its burden to obtain judgment on the pleadings with respect to Count III. Ramirez, C.R., and Espinosa may proceed with their negligence claim against U.S. Smelter.

## II.    NIED

Next up is Count VI, a claim of negligent infliction of emotional distress brought by all Plaintiffs against U.S. Smelter. The claims are based on Plaintiffs' allegations that Defendants' activities many decades ago caused them to come in contact with contaminants on their properties, and as a result they have suffered emotional distress from the fear that they or their family members could contract an illness in the future. [DE 224, ¶¶ 29 (Plaintiffs were "exposed to lead, arsenic, and/or other toxic substances"), 104 (Plaintiffs "ingested hazardous levels of lead . . . while a resident of the Site"), 105 (Plaintiffs have "experienced and/or suffered an increased risk of experiencing one or more of the following injuries," including *inter alia* fainting, high blood pressure, lung disease, decreased IQ, hyperactivity, aggression), 106 (Plaintiffs "suffered severe emotional distress as a direct and proximate result of his or her direct physical contact with lead, arsenic or other chemical contamination at the Site by their ingestion of the same into their bodies, and the resulting fear of illness, permanent injury and death to themselves and their children"), 162 (Plaintiffs were "exposed to a disease-causing agent or substance"), 163 (Plaintiffs "actually ingested the harmful agents into their bodies").]

13

Most of the Plaintiffs reassert NIED claims based on the severe emotional distress caused by "an increased risk of experiencing" medical conditions associated with exposure to lead contamination, such as decreased IQ, hyperactivity, and aggression (among numerous other conditions defined at various levels of generality, like "weight loss" and "personality change"). *Id.*, ¶¶ 105, 150. In contrast, Ramirez, C.R., and Espinosa allege that they not only suffered an "increased risk" of contracting one of these ailments, but that they have respectively contracted "non-genetic environmental ovarian cancer," "cognitive and developmental learning disabilities," and "cancer" as a result of ingesting lead contamination. *Id.*, ¶¶ 151–53, 156.

U.S. Smelter targets the claims of all of the Plaintiffs except for Ramirez, C.R., and Espinosa - evidently conceding that, to the extent these three Plaintiffs have stated negligence claims, they can also proceed on their NIED claims based on their diagnosed physical ailments allegedly caused by exposure to lead contamination. I previously concluded that only Ramirez, C.R., and Espinosa adequately alleged facts establishing direct physical impacts to proceed with their parallel NIED claims against DuPont and Hammond Lead under Indiana's "modified impact rule." However, the rest of the Plaintiffs failed to adequately allege facts establishing such impacts caused by the defendants' lead contamination, so their claims were dismissed. [DE 251 at 24–30.] Plaintiffs then rehashed numerous arguments in connection with the dismissal of their NIED claims [DE 257 at 3–24], which I reviewed and ultimately rejected in a recent order denying their motion for reconsideration. [*See* DE 294.]

In the present motion, the only argument U.S. Smelter makes for dismissal of Plaintiffs' NIED claims is that all but Ramirez, C.R., and Espinosa do not have "a viable underlying negligence claim," so they cannot proceed with a "standalone" NIED claim. [DE 263 at 8–9.] As explained below, this argument, in isolation, does not carry the day. But for the same reasons addressed in my prior orders, the vast majority of the named plaintiffs' allegations fall short of stating plausible claims under what has come to be known as Indiana's "modified impact" rule.

U.S. Smelter's argument is based on language in the Indiana Supreme Court's decision in *Spangler v. Bechtel*, 958 N.E.2d 458 (Ind. 2011). In ruling on the initial round of motions to dismiss, Judge Van Bokkelen was persuaded that, under *Spangler*, a plaintiff cannot state an "independent, stand-alone" NIED claim unless the plaintiff has a properly pled negligence claim. [DE 157 at 15.] In ruling on the renewed motions to dismiss filed by DuPont and Hammond Lead, I took at face value *Spangler*'s admonition that Indiana law had "never permitted . . . an action seeking damages for emotional distress predicated upon a breach of an alleged duty not to inflict emotional injury on another," and "independent, stand-alone actions for negligent infliction of emotional distress are not cognizable in Indiana." 958 N.E.2d at 466. *See, e.g.*, *Vestal v. Heart of CarDon, LLC*, 2018 WL 3008638, at *12 (S.D. Ind. June 15, 2018) (applying *Spangler*) (NIED "is not a stand-alone cause of action, but instead is permitted . . . where the 'defendant's breach of a legal duty to the plaintiff' causes a 'direct impact' upon the plaintiff"). I therefore agreed with Judge Van Bokkelen that most of the Plaintiffs'

claims must be dismissed, couching the holding in the language used in *Spangler.* That meant only Ramirez, C.R., and Espinosa could proceed on their NIED claims because they had viable "ordinary" negligence claims based on their present physical injuries. [DE 251 at 30.]

*Spangler* further recognized that emotional-distress damages are recoverable in a negligence-based claim only when a party satisfies either the "modified impact rule" or the "bystander rule." 958 N.E.2d at 466. As I've noted before, we can set the bystander rule aside for present purposes. Under that rule, a NIED claim is permitted, even without a direct physical impact, when the plaintiff has "witnessed or come to the scene soon thereafter the death or severe injury of certain classes of relatives." *Id.* The bystander exception obviously does not apply here.

But what about the so-called "modified impact" rule? This is where things can get murky under Indiana law. It used to be that, in evaluating NIED claims, Indiana followed what courts referred to as the "impact rule"—aptly named "because of the requirement that there be some physical impact on the plaintiff before recovery for mental trauma will be allowed." *Shuamber v. Henderson*, 579 N.E.2d 452, 454 (Ind. 1991) (emphasis added) (citing *Kalen v. Terre Haute & I.R.R. Co.*, 47 N.E. 694 (Ind. Ct. App. 1897)). The rule, which had "been the law of the land in Indiana" for over "one hundred years," required a showing of "three elements" to proceed on a NIED claim: "(1) an impact on the plaintiff; (2) which causes *physical injury* to the plaintiff; (3) which

physical injury, in turn, causes the emotional distress." *Id.* (emphasis added) (citing

*Boston v. Chesapeake & O. Ry.*, 61 N.E.2d 326, 327 (Ind. 1945)).

However, in *Shuamber*, the Indiana Supreme Court "re-examined" the impact

rule and held that when "a plaintiff sustains a direct impact by the negligence of

another and, by virtue of that direct involvement sustains an emotional trauma which is

serious in nature and of a kind and extent normally expected to occur in a reasonable

person, . . . such a plaintiff is entitled to maintain an action to recover for that emotional

trauma without regard to whether the emotional trauma arises out of or accompanies

any physical injury to the plaintiff." *Id.* at 455–56. This did away with the old "impact

rule," meaning that the physical injury requirement was replaced with the requirement

that a plaintiff show a direct physical *impact*, coupled with emotional distress.

Reaffirming *Shuamber*, the Indiana Supreme Court in *Spangler* reiterated that "we have

permitted recovery so long as *the plaintiff personally sustained a physical impact*, in

addition to emotional distress damages." 958 N.E.2d at 467 (emphasis added). This is

the so-called "modified impact" rule.

Post-*Shuamber* case law addresses the scope of the modified impact rule. *Atlantic

Coast Airlines v. Cook*, 857 N.E.2d 989 (Ind. 2006) is one useful illustration cited favorably

by the Indiana Supreme Court in *Spangler*. In *Cook*, the plaintiffs were involved in a

harrowing incident on a aircraft shortly after the 9/11 tragedy. Essentially, the plaintiffs

contended that the airline (and others) were negligent in allowing another passenger to

board the aircraft who later engaged in menacing behavior in flight. That passenger

17

marched up and down the aisle, threatened others on board, and perpetually smoked cigarettes despite rules to the contrary. 857 N.E.2d at 991–92. In a post-9/11 world, the plaintiffs were justifiably terrified by the incident. They argued that breathing smoke from a lit cigarette and experiencing vibrations from stomping feet caused a direct physical impact, as well as a "constructive" impact" by virtue of the physical effects on the [plaintiffs'] vital body functions," like breathing, heart rate, and acuteness of their senses. *Id.* at 998.

With this backdrop, the Court examined case law on the physical impact requirement, *id.* at 998–99, and concluded that "constructive impact" in the form of a "physical change"—for example "the destruction of healthy lung tissue" as a result of a physician's failure to diagnose a plaintiff's lung cancer—can satisfy the rule. *Id.* (citing *Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000)). However, the plaintiffs merely alleged "what can best be described as the human body's natural response to fear and anxiety," which fell short of a physical change.

The Court in *Cook* then considered whether smelling cigarette smoke and feeling floor vibrations could form a direct physical impact. *Id.* at 999. While the Court noted plaintiffs' theory "at the very least . . . stretches the outer limits of the impact requirement," it accepted that plaintiffs may experience sensations related to exposure to smoke and vibrations that "may be characterized as physical impact," even if "certainly very 'slight,'" and went on to consider whether the plaintiffs' alleged "mental anguish [that] is 'not likely speculative, exaggerated, fictitious, or unforeseeable.'" *Id.*

18

(quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1221 (Ind. 2000)). The evidence suggested plaintiffs' fear and anxiety were real but transitory, and they never sought medical treatment for their alleged impacts. The Court accordingly concluded "the physical impact in this case was slight to nonexistent," and "speculative," so "allowing an emotional distress claim to proceed based on [the plaintiffs'] lingering mental anguish would essentially abrogate the requirements of Indiana's modified impact rule." *Id.* at 1000.

      *Cook* reflects just how difficult it is to meet the modified impact rule under Indiana law. Indeed, the Supreme Court's statement that the facts in *Cook* stretch "the outer limits of the impact requirement" proves the point. It is tantamount to outright skepticism as to the viability of claims of direct physical impact based on exposure.

      It's true that *Cook* is not a direct comparator to the facts asserted in this case. Yet, as the extensive briefing in this case reflects, there are no precedents directly on point with the situation presented: where a plaintiff asserts that mere *exposure* to contaminants in soil caused by pollution that took place many decades earlier on adjacent properties, in the absence of a diagnosed medical condition allegedly caused by the exposure, constitutes a direct physical impact under Indiana's modified impact rule. The root of the issue is that the proper application of the modified impact rule in the context of toxic torts is ill defined. Indeed, in a recent case, Judge DeGuilio observed that Indiana case law provides no clear answer to whether exposure to toxic substances "constitutes direct impact." *Hostetler v. Johnson Controls Inc.*, 2021 WL 5087261, at *15 &

n.11 (N.D. Ind. Nov. 2, 2021). And the fact that the Indiana Supreme Court has expressly construed *Cook* and related cases as "carefully circumscrib[ing]" the "right to seek damages for emotional distress in actions for negligence" while reiterating that "independent, stand-alone actions for negligent infliction of emotional distress are not cognizable in Indiana" certainly muddies the water in the absence of clear authority applying the modified impact rule to situations involving toxic torts. *Spangler*, 958 N.E.2d at 466 (citing *Cook*, 857 N.E.2d at 998).

What's clear is that one may assert a NIED claim under the bystander rule or modified impact rule in the absence of allegations of present physical injuries required to state an ordinary negligence claim. But to do so, the plaintiff must make out a "direct impact" that would cause a reasonable person emotional distress. And, as reaffirmed in *Cook*, such a direct impact is necessarily "physical" in nature; claims based on impacts that are "slight," such as mere exposure to toxic contamination, are insufficient to make out a claim. Moreover, the majority of precedents in this area have found direct physical impacts based on concrete physical harms (as opposed to speculative injuries that could develop in the future) with a direct nexus to the defendant's allegedly negligent acts. *See, e.g., Alexander v. Scheid*, 726 N.E.2d 272 (Ind. 2000) (destruction of lung tissue); *Bader v. Johnson*, 732 N.E.2d 1212 (Ind. 2000) (pregnancy); *Delta Airlines v. Cook*, 821 N.E.2d 400 (Ind. Ct. App. 2005) (physical changes from confrontation, such as increased pulse, breathing, heart rate, and adrenaline); *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991 (Ind. Ct. App. 1998) (consumption of worm); *Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185

(Ind. Ct. App. 1998) (plaintiff stabbed with random needle hidden in toilet paper roll in hotel bathroom); *Conder v. Wood*, 691 N.E.2d 490 (Ind. Ct. App. 1998) (hitting vehicle with fist). *See also Z.D. v. Community Health Network, Inc.*, 217 N.E.3d 527, 538 (Ind. 2003) (explaining physical impact requirement limits recovery of emotional distress damages to situations involving "a direct, but also physical, nexus between the negligence and the resulting distress," such that the "distress is readily ascertainable").

In sum, most of Plaintiffs' factual allegations of mere exposure to contaminants and an increased risk of developing ailments (as opposed to diagnosed physical conditions) do not sufficiently plead a direct physical impact required to state NIED claims under Indiana's modified impact rule. By contrast, Ramirez, C.R., and Espinosa, who allege diagnosed health conditions (*i.e.*, physical changes in their bodies as a result of their alleged exposure to U.S. Smelter's toxic contamination, which give rise to emotional distress any reasonable person would feel upon receiving such a diagnosis), may proceed with their NIED claims against U.S. Smelter.

## III.    Strict Liability

Finally, in Count I, Ramirez, C.R., and Espinosa assert a strict liability claim against U.S. Smelter, based on its "manufacture, processing, storage, and use of materials resulting in the release of lead and other hazardous particles . . . on and around the Site." [*See* DE 224, ¶ 115.] "Indiana recognizes the doctrine of strict liability stemming from carrying on an abnormally dangerous activity." *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989) (citing *Enos Coal Mining Co.*

*v. Schuchart*, 188 N.E.2d 406 (1963); *Erbrich Products Co. v. Wills*, 509 N.E.2d 850 (Ind. Ct.

App. 1987)). To assess if an activity is subject to strict liability, Indiana courts apply the

standard enumerated in the Restatement (Second) of Torts, which provides that one

who carries on "an abnormally dangerous activity is subject to liability for harm to the

person, land or chattels of another resulting from the activity, although he has exercised

the utmost care to prevent the harm," and such liability is "limited to the kind of harm,

the possibility of which makes the activity abnormally dangerous." *Fechtman v. U.S.

Steel Corp.*, 994 N.E.2d 1243, 1247 (Ind. Ct. App. 2013) (citing Restatement (Second) of

Torts § 519 (1977)).

Courts consider six factors to evaluate if an activity is "abnormally dangerous,"

including: (1) the existence of a high degree of risk of harm to the person, land, or

chattels of others; (2) the likely severity of that harm; (3) the inability to eliminate risk

by the exercise of reasonable care; (4) the extent to which the activity is not a matter of

"common usage"; (5) the inappropriateness of the activity for the place where it is

carried on; and (6) the extent to which its value to the community is outweighed by its

dangerous attributes. *Id.* (citing Restatement (Second) of Torts § 520 (1977); *Bridges v. Ky.

Stone Co., Inc.*, 425 N.E.2d 125, 126 (Ind. 1981); *Erbrich*, 509 N.E.2d at 853). In applying

these factors, I must consider "the defendant's activity as a whole." *Id.* (citing *Erbrich*,

509 N.E.2d at 856). The "essential question is whether the risk created is *so unusual*,"

either due to its "magnitude or because of the circumstances surrounding it" to justify

strict liability in tort. *Id.* at 1248–49 (emphasis added) (quoting Restatement (Second) of Torts § 520 cmt. f (1977)). This standard strikes me as amorphous and difficult to apply.

Judge Kolar previously determined that "case law can be read to suggest that the alleged activities are not abnormally dangerous as a matter of law," and accordingly granted leave for Ramirez, C.R., and Espinosa to pursue strict liability claims. [DE 180 at 16–19; *see* DE 157 at 15–16.] U.S. Smelter asserts that its alleged activities are not "abnormally dangerous" under applicable law. As noted in my prior order [DE 251 at 32], Judge Van Bokkelen did not address this independent ground for dismissal in ruling on Defendants' first round of motions to dismiss. I agree with U.S. Smelter that its alleged activities were not "abnormally dangerous," as that phrase has been narrowly construed by the state courts, so the strict liability claim will be dismissed.

For starters, because of how Indiana has defined what amounts to "abnormally dangerous" behavior, the scope of strict liability is extremely narrow. Indeed, the Seventh Circuit has observed, "Indiana courts have generally been reluctant to impose strict liability based on the abnormally dangerous activity doctrine." *Consol. Rail Corp. v. Allied Corp.*, 882 F.2d 254, 257 n.3 (7th Cir. 1989). In *Fechtman*, the state's Court of Appeals put it even simpler terms."It appears that strict liability for abnormally dangerous activities has been limited in Indiana to blasting" and (weirdly) "housing wild animals in a residential area." *Fechtman*, 994 N.E.2d at 1250 (collecting cases).

Canvassing case law applying the relevant factors to analogous situations, I am persuaded that U.S. Smelter's alleged manufacturing activities are not "abnormally

23

dangerous" in light of the foregoing factors. I'll take *Fechtman* at its word. Judge Kolar,
for his part, identified a number of "cases in which manufacturing processes that led to
contamination," like the one at issue in this case, "were found not to be abnormally
dangerous." [DE 180 at 18.] Take for example *Erbrich Products Company v. Wills*. There,
the court held that manufacturing and storing chlorine gas was not abnormally
dangerous. 509 N.E.2d at 856. The court reasoned: "If the rule were otherwise, virtually
any commercial or industrial activity involving substances which are dangerous *only in
the abstract* automatically would be deemed as abnormally dangerous. This result would
be intolerable." *Id.* (emphasis added).

Moreover, to the extent the defendant could limit risks from the disputed activity
through the exercise of reasonable care, the court in *Erbrich* held that strict liability does
not attach. *Id. Accord Dow Chem. Co. v. Ebling*, 723 N.E.2d 881, 909 (Ind. Ct. App. 2000)
(application of pesticides not ultra-hazardous activity subject to strict liability). Indeed,
the Seventh Circuit has applied *Erbrich* in holding that a defendant's handling of PCBs
(a set of highly carcinogenic chemical compounds, formerly used in industrial and
consumer products) is not abnormally dangerous activity – noting that risks associated
with the chemicals' disposal could have been limited by the defendant's exercise of
reasonable care. *Westinghouse Elec. Corp.*, 891 F.2d at 616–17.

Here, the SAC asserts that the defendants "manufactured, processed, stored,
and/or used materials on its property that could and did result in the release of lead
and other hazardous substances impacting persons and property on and around the

24

[Superfund Site]," and that the "manufacture, processing, storage, and use of materials resulting in the release of lead and other hazardous particles . . . constitutes abnormally dangerous and ultrahazardous activity." [DE 224, ¶¶ 115–16.] Atlantic Richfield, DuPont, and Hammond Lead are alleged to have historically manufactured white lead, lead arsenate insecticide, other unidentified "lead substances," and/or zinc oxide on their properties, and to have released these contaminants during their production processes. *Id.*, ¶¶ 51–56 (DuPont), 67–71 (Hammond Lead). The SAC lays out a more detailed set of factual allegations about U.S. Smelter's alleged operation of a lead smelter and stockpiling of lead dust and spreading of waste over adjoining wetlands and properties. *See id.*, ¶¶ 32–46. U.S. Smelter is accused of generating "airborne emissions . . . from plant stacks into the surrounding area, contaminating the land on which Plaintiffs' homes and yards were built," piling and spreading "blast furnace slag, which contained lead and other hazardous substances, on its property adjacent to the Site," and stockpiling lead-containing dust on wetlands adjacent to the property "[s]outh of its plant building." *Id.*, ¶¶ 40–41, 45. This activity allegedly caused lead, arsenic, and other contaminants to become deposited into land on which Plaintiffs' homes were built, getting into the groundwater, soil, and interiors of Plaintiffs' homes, causing them to suffer damages. *Id.*, ¶ 46.

There's a clear distinction between mere manufacturing of products involving lead and arsenic (of which all defendants stand accused) and disposing of toxic waste adjacent to a residential neighborhood (what Plaintiffs claim U.S. Smelter did). In ruling

on the motions to dismiss, I had no occasion to determine whether allegations of stockpiling and spreading waste byproducts of the sort alleged formed a basis for abnormally dangerous activity under the foregoing standard – and I said as much. [DE 251 at 36 ("*To the extent* those alternative allegations form a basis for 'abnormally dangerous' activity . . . , they are not raised in the complaint [as to Atlantic Richfield, DuPont, or Hammond Lead].").] But at the end of the day, there is really no difference under the exceedingly narrow standard proscribed by state law.

While Plaintiffs analogize the activity in question to distinct situations, like crop dusting (a process which involves as its object and purpose spreading toxic chemicals for an instrumental, often agricultural, purpose), they fail to identify any Indiana cases indicating that a manufacturer's stockpiling or dumping of hazardous byproducts constitutes abnormally dangerous activity subject to strict liability. Nor do they meaningfully dispute that the doctrine, as articulated by the state courts, is narrowly construed to apply to only a thin category of activities – none of which squarely fit this case. Here, there is no suggestion that the purpose or objective of U.S. Smelter's manufacturing activities was to produce the toxins in question. And even accepting as true that the dumping of lead byproducts was conducted in "close proximity" to residential neighborhoods—a claim which appears facially implausible, insofar as the vast majority of the activity occurred at a time when the surrounding area was industrial, not residential, and Plaintiffs claim the dumping occurred "south" of the plant, whereas residences were located north of the plant—such risks could have been

26

limited by the exercise of reasonable case. *Accord Westinghouse Elec. Corp.*, 891 F.2d at 616–17. Indeed, the history of prior EPA enforcement suggests that the activities in question could have been made safe through the exercise of reasonable care. *See, e.g.,* *Dow Chem.*, 723 N.E.2d at 908–09 (EPA registration of pesticide weighed against finding that its production was abnormally dangerous activity).

In sum, the facts alleged in the SAC fall short of plausibly stating that U.S. Smelter's historic smelting, stockpiling, and dumping activities are abnormally dangerous or ultrahazardous activities under Indiana law. U.S. Smelter is therefore entitled to judgment on the pleadings on Plaintiffs' strict liability claim.

**ACCORDINGLY:**

For the reasons explained in this order, Defendant U.S. Smelter and Lead Refinery, Inc.'s Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure [DE 262] is **GRANTED IN PART** and **DENIED IN PART**, as follows:

Count I, asserting a strict liability claim against U.S. Smelter, is **DISMISSED WITH PREJUDICE** for failure to state a claim.

Plaintiffs Minerva Ramirez, C.R., and Liduvina Espinosa may proceed with their NIED claim against U.S. Smelter (Count VI). As to all other named Plaintiffs, Count VI is **DISMISSED WITH PREJUDICE**.

In all other respects, the motion [DE 262] is **DENIED**.

**SO ORDERED**.

27

ENTERED: July 10, 2024.

                                         /s/ Philip P. Simon
                                         PHILIP P. SIMON, JUDGE
                                         UNITED STATES DISTRICT COURT